[Nos. A098073, A100745, A104701. First Dist., Div. One. Aug. 29, 2006.]

MARGIE McRAE, Plaintiff and Respondent, v.
DEPARTMENT OF CORRECTIONS AND REHABILITATION, Defendant and Appellant.

[Nos. A098330, A098910. First Dist., Div. One. Aug. 29, 2006.]

MARGIE McRAE, Plaintiff and Appellant, v.
BRUCE WILTSE et al., Defendants and Respondents.

COUNSEL

Bill Lockyer, Attorney General, Andrea Lynn Hoch, Chief Assistant Attorney General, Jacob A. Appelsmith, Assistant Attorney General, Miguel A. Neri, Fiel D. Tigno, Lyn Harlan and Karen L. Donald, Deputy Attorneys General, for Defendant and Appellant and for Defendants and Respondents.

Carter & Schear, Jana Carter, Stephen D. Schear; Law Offices of Ellen Lake and Ellen Lake for Plaintiff and Respondent and for Plaintiff and Appellant.

OPINION

**STEIN, Acting P. J.**—Dr. Margie McRae filed suit against her employer, the California Department of Corrections and Rehabilitation (the Department) and four individual defendants, seeking damages for discrimination and retaliation in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

The trial court granted summary judgment to the four individual defendants, and Dr. McRae appeals from an order awarding these defendants their costs. (Case Nos. A098330 & A098910.) The case proceeded to trial against the Department. The jury returned a verdict against Dr. McRae on her claim of discrimination, but awarded her $75,000 on her claim of retaliation. The Department appeals from the judgment entered on the jury's verdict, and

from postjudgment orders awarding attorney fees to Dr. McRae. (Case Nos. A098073, A100745, & A104701.)[1]

We reverse, finding that the evidence does not support the jury's verdict that Dr. McRae was the subject of actionable retaliation. We also reverse the orders awarding Dr. McRae her attorney fees. Finally, we affirm the order awarding costs to the individual defendants and remand the matter to the trial court to award costs to the Department to the extent those costs are not duplicative of those awarded to the individual defendants.[2]

## BACKGROUND

In 1992, Dr. McRae, an African-American woman and a board certified surgeon, began working for the California Medical Facility in Vacaville (CMF), a hospital administered by the Department, where prisoners are treated. For several years there were no complaints about the quality of Dr. McRae's work. To the contrary, she regularly and uniformly received excellent performance evaluations. In 1995, Dr. McRae applied for a position as Chief Medical Officer (CMO) at the California State Prison in Solano (Solano Prison), a separate facility, with its own administration, located close to CMF. In May 1996, Dr. Jessica Clarke, a Caucasian woman, was selected for that position, and Dr. McRae continued to work at CMF. Approximately one year later, on April 25, 1997, Dr. McRae filed a complaint with the Department of Fair Employment and Housing (DFEH), claiming that she was denied the appointment at Solano Prison because of her race. In Dr. McRae's view, her filing of this complaint triggered a number of retaliatory actions by the Department that culminated in her involuntary transfer to a position at Solano Prison.

---

[1] This is the second time we have considered this appeal. After we reversed the judgment, in an opinion filed on March 18, 2005, the Supreme Court granted review. It later transferred the case back to us to reconsider in light of its decision in *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028 [32 Cal.Rptr.3d 436, 116 P.3d 1123] (*Yanowitz*). We have done so, and conclude that although *Yanowitz* has an effect on our analysis, it does not alter our conclusion. The Supreme Court also directed us to reconsider our opinion in light of *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074 [6 Cal.Rptr.3d 457, 79 P.3d 569], which, as relevant, held that an employee is entitled to seek relief through the FEHA without first exhausting internal remedies available to the employee through the administrative process. While our earlier opinion did not specifically discuss the right to sue, it did suggest that as a general rule a disciplinary employment action will not ripen into an actionable adverse action while the employee retains the power to contest and correct it through internal grievance procedures. That discussion is not necessary to our decision, and we do not repeat it here.

[2] The trial court reasoned that since there were five defendants, each would be awarded one-fifth of the costs. Dr. McRae contends that the Department actually paid all of the costs; therefore, the court erred in awarding costs to the individual defendants. As we reverse the judgment, Dr. McRae will be responsible for all of the disputed costs, whether they were paid by the Department or by the individual defendants. There is therefore no reason to decide how those costs should be divided among the various defendants.

Dr. Raymond Andreasen, the CMO at CMF, was Dr. McRae's supervisor. Dr. Andreasen was not on the hiring committee for Solano Prison, and there is no evidence that he was involved in the decision to hire Dr. Clarke. Dr. McRae nonetheless theorized that Dr. Andreasen engaged in or engineered a number of retaliatory actions taken against her in response to her complaints about hiring at Solano Prison. According to Dr. McRae, these actions began in May 1997, when Dr. Andreasen wrote two memoranda to his files. Dr. Andreasen referred to reports that Dr. McRae, who was then on duty as the emergency room physician, had left her post unattended. The memoranda were written shortly after notice of Dr. McRae's DFEH complaint was sent to Dr. Andreasen, and, under Dr. McRae's theory, were written not because Dr. McRae left her post, but to begin a process of discipline as a means of retaliating against Dr. McRae for filing the DFEH complaint.

Dr. Andreasen testified that by June, he had received reports that Dr. McRae had been coming in late and had, on one occasion, left after approximately one hour of work without notifying the CMO's office that she was going to take time off. Dr. Andreasen scheduled a meeting with Dr. McRae on June 9, but Dr. McRae called in sick. Dr. Andreasen rescheduled the meeting for the following day, but Dr. McRae did not appear. She was paged and stated that she would not be able to attend the meeting because she was taking a training session. The meeting was rescheduled again, for the next day. Dr. McRae again called in sick. A few days later, Dr. Andreasen's administrative assistant reported that Dr. McRae had left her post in the emergency room without notice and without securing proper physician coverage. Dr. Andreasen then issued a "Letter of Instruction" to Dr. McRae, advising her that her conduct violated provisions of the California Code of Regulations and Dr. Andreasen's own memoranda. He instructed Dr. McRae to read and familiarize herself with the cited regulations and memoranda, and to notify her supervisor about any need to leave her job site or to report in late. Dr. Andreasen wrote, further, that the letter of instruction was "not to be construed as punitive or adverse in nature. It represents formal instructions and a means of documenting a situation which needs correction and gives guidelines for the performance of your duties." Dr. Andreasen wrote that the letter would be placed in Dr. McRae's personnel file for one year, at which time she was entitled to submit a written request to have it removed. Dr. McRae refused to accept or sign the letter, and Dr. Andreasen placed it in his supervisory file. Dr. McRae asserted that the letter of instruction also was written to retaliate against her for complaining about discrimination in hiring at Solano Prison.

Six months later, Dr. Andreasen asked for an internal affairs investigation into whether Dr. McRae had disobeyed his direct order to contact a patient's distraught family, and also whether she had failed to release information that would allow the patient to be moved to hospice. A month later, Dr. Joseph

Bick, the director of CMF's HIV unit, requested an investigation into whether Dr. McRae had made a telephonic order to withhold antibiotics from a patient who had been admitted with a preliminary diagnosis of pneumonia, without first examining the patient. Dr. Andreasen amended his request to include Dr. Bick's allegations, and referred the matter to the warden's office. The allegation relating to the transfer to hospice was dropped at the outset, but the investigation went forward on the other allegations. On April 10, 1998, the investigator submitted her report to Warden Ana Ramirez Palmer, summarizing her interviews of Dr. Andreasen, Dr. Bick, Dr. McRae and three nurses on duty during the time that Dr. McRae was charged with the responsibility of caring for the second patient.

About the same time, Dr. McRae was involved in a confrontation with two male nurses. The confrontation was triggered by Dr. McRae's actions with respect to a "HEPA" air filter. The filter, which destroys bacteria, was located close to Dr. McRae's desk, and she was concerned that it might be leaking ultraviolet light. She filed a grievance, asking that the filter be moved. When the grievance was denied, Dr. McRae simply unplugged and moved the filter herself. A pattern apparently developed, where Dr. McRae would unplug and move the filter, and when she left the room, someone would move it back.

On the morning of April 16, 1998, Dr. McRae had unplugged and moved the filter and was treating a patient at her desk. The two nurses, defendants Bruce Wiltse and Robert Burkhart, entered and confronted Dr. McRae about her actions. Nurse Burkhart moved the filter back, and plugged it in. Dr. McRae unplugged it. This happened three times. Nurse Burkhart told Nurse Wiltse to call Dr. Andreasen. Dr. McRae then grabbed the telephone and called Dr. Kevin Geraghty, her union representative, telling him to come immediately. Dr. Andreasen arrived first. According to Dr. McRae, as she was telling Dr. Andreasen what had happened, Nurse Burkhart shouted, "Liar, liar," jabbed his finger at her face, and at one point touched her on the hand as she was attempting to shield her face from him. Dr. McRae complained that Dr. Andreasen didn't tell Nurse Burkhart to stop, but just stood there. Dr. Geraghty testified that he came into the room about that time. Dr. Andreasen was there, but did not appear to be doing anything. After Dr. Geraghty called Dr. Andreasen by name, Dr. Andreasen left the room with Nurse Wiltse and Nurse Burkhart. Dr. McRae testified that although Dr. Andreasen was present for a couple of minutes before Dr. Geraghty arrived, he took no action until Dr. Geraghty indicated he was there. Dr. McRae went out on nonindustrial disability leave the next day, and sought a restraining order against Nurse Burkhart and Nurse Wiltse. Dr. McRae complained that the Department provided legal representation for the nurses, but did not provide Dr. McRae with counsel with whom, presumably, she intended to prosecute her complaint against the nurses.

On May 14, 1998, one month after going out on disability leave, Dr. McRae filed a second DFEH complaint, alleging that the June 1997 letter of instruction had been issued by Dr. Andreasen to retaliate against her for filing her first DFEH complaint alleging discrimination in hiring at Solano Prison.

On June 25, 1998, Warden Ramirez-Palmer recommended that Dr. McRae be suspended for 30 days. This recommendation was passed on to Donna Wilson, Chief Deputy of Clinical Services, and from her to Dr. Susann Steinberg, Deputy Director of Health Care Services Division, for final approval. Dr. Steinberg signed off on the proposed action on July 14, 1998, and a statement of adverse action was drafted. The statement informed Dr. McRae of the reasons for the action, also informing her of her right to appeal the action to the State Personnel Board. It also informed her that she had the right to respond to the notice in writing to Dr. Wilson, explaining that Dr. Wilson retained the discretion to alter the notice. The letter was not sent to Dr. McRae, and Dr. McRae was not suspended, at least in part because by that time she was no longer working at CMF. Dr. McRae did not learn about the decision until after she filed her complaint.

Dr. McRae believed that Dr. Andreasen initiated the investigation as a further means of retaliating against her for her complaint about hiring at Solano Prison. She asserted that the decision to drop the second allegation demonstrated the Department's bad faith because it could and should have been reported there was not a sufficient basis for a finding against her on that allegation. In Dr. McRae's opinion, the decision to suspend her was made to retaliate against her for having filed the first and second DFEH complaint, and the failure to notify her of that decision, or, apparently, to implement it, was an attempt to cover up the Department's wrongdoing.

On July 29, 1998, Dr. Wilson wrote to Dr. McRae that her disability leave would expire on August 15, directing her to report to work at Solano Prison rather than return to work at CMF. Dr. Wilson wrote: "You are being transferred to Solano in an effort to resolve several of your safety concerns here at CMF. Your transfer to Solano will alleviate your concerns about working in close proximity to Mr. Wiltse and Mr. Burkhart and will resolve the Temporary Restraining Orders on file with the Solano County District Attorney's Office. Your transfer to Solano will also resolve your concerns regarding exposure to the Hepa Filter and UV light, your concerns with the B-1 Clinic health hazards and inadequate B-1 office space. Your transfer to Solano will also resolve your concerns about having to perform MOD duty."[3]

---

[3] Dr. McRae had complained that she was required to perform MOD (medical officer of the day) duty, when one of the other physicians had been relieved of that responsibility.

Dr. McRae filed a third DEFH complaint on August 18, 1998, asserting that the transfer was a retaliatory act, and requesting that the decision to transfer her be reversed. On August 25, Dr. Wilson informed Dr. McRae that her grievance had been denied. In March 1999, Dr. McRae reported to work at Solano Prison, but left within three weeks, filing this action two and one-half weeks later.

## RETALIATION

■ Government Code section 12940 , subdivision (h) makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (See also Lab. Code, § 1102.5, subd. (b).) To establish a prima facie case of retaliation, the plaintiff must show he or she engaged in a "protected activity," the employer subjected the employee to an adverse employment action, and a causal link existed between the protected activity and the employer's action. (*Yanowitz, supra,* 36 Cal.4th at p. 1042.)

It is not contested that Dr. McRae engaged in "protected activity"—the filing of DFEH claims. We therefore turn to the second and third elements of Dr. McRae's claim.

*Adverse Employment Action*

■ In California, an employee seeking recovery on a theory of unlawful discrimination or retaliation must demonstrate that he or she has been subjected to an adverse employment action that materially affects the terms, conditions, or privileges of employment, rather than simply that the employee has been subjected to an adverse action or treatment that reasonably would deter an employee from engaging in the protected activity. (*Yanowitz, supra,* 36 Cal.4th at pp. 1051–1052.) "A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient." (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1455 [116 Cal.Rptr.2d 602] (*Akers*).) " '[W]orkplaces are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action.' [Citation.] If every minor change in working conditions or trivial action were a materially adverse action then any 'action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.' [Citation.]" (*Thomas v. Department of Corrections* (2000) 77 Cal.App.4th 507, 511 [91 Cal.Rptr.2d 770].) The plaintiff must show the employer's retaliatory actions had a detrimental and substantial effect on the plaintiff's employment. (*Akers, supra,* at p. 1455; *Thomas, supra,* at pp. 510–511; and

see *Robinson v. City of Pittsburgh* (3d Cir. 1997) 120 F.3d 1286, 1300 & *Torres v. Pisano* (2d Cir. 1997) 116 F.3d 625, 640.)[4]

■ "Requiring an employee to prove a substantial adverse job effect 'guards against both "judicial micromanagement of business practices" [citation] and frivolous suits over insignificant slights.' [Citation.] Absent this threshold showing, courts will be thrust into the role of personnel officers, becoming entangled in every conceivable form of employee job dissatisfaction. While the Legislature was understandably concerned with the chilling effect of employer retaliatory actions and mandated that FEHA provisions be interpreted broadly to prevent unlawful discrimination, it could not have intended to provide employees a remedy for any possible slight resulting from the filing of a discrimination complaint." (*Akers, supra,* 95 Cal.App.4th at p. 1455.) In addition, while the employee and the public have a significant interest in preventing discrimination or retaliation for engaging in protected activity, those are not the only interests at stake. The employer and the public have a legitimate interest in efficient, cost-effective, and high-quality work. Employers need to be able to manage employees without fear that routine employment decisions, or attempts at improving employee performance, will lead to litigation. Employees themselves have an interest in learning if their work habits are substandard, particularly if they wish to advance in their professions. "On the one hand, we worry that employers will be paralyzed into inaction once an employee has lodged a complaint . . . , making such a complaint tantamount to a 'get out of jail free' card for employees engaged in job misconduct. On the other hand, we are concerned about the chilling effect on employee complaints resulting from an employer's retaliatory actions." (*Brooks v. City of San Mateo* (9th Cir. 2000) 229 F.3d 917, 928.)

It follows, in part, that although an employer's "intermediate" action may be retaliatory, it does not form the basis of an FEHA retaliation claim unless it has or will have a substantial and material adverse effect on the terms and conditions of the plaintiff's employment. (*Pinero v. Specialty Restaurants Corp.* (2005) 130 Cal.App.4th 635, 641 [30 Cal.Rptr.3d 348]; *Akers, supra,* 95 Cal.App.4th at p. 1455.) Nonetheless, it also is true that in many cases, the employee is affected by a series of employment actions, at least some of which might not, in and of themselves, constitute a material change in the terms or conditions of employment. In such cases, it is appropriate to

---

[4] The United States Supreme Court, in *Burlington North. & Santa Fe Ry. Co. v. White* (2006) 548 U.S. ___ [165 L.Ed.2d 345, 126 S.Ct. 2405], affirmed that a plaintiff seeking damages for retaliation under title VII of the Civil Rights Act of 1964 must show *material* adversity (*id.* at p. 2415), but also held that the scope of the antiretaliation provision, 42 United States Code section 2000e-3(a), extends beyond workplace-related or employment-related retaliatory acts and harm. (*Burlington North. & Santa Fe Ry. Co. v. White*, at p. ___ [126 S.Ct. at p. 2414].) As Dr. McRae's claims are based on employment-related acts and harm we need not consider whether the Supreme Court's analysis of title VII has any effect on California law.

consider the plaintiff's allegations collectively under a totality of the circumstances approach. There "is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries." (*Yanowitz, supra,* 36 Cal.4th at p. 1055.) In *Yanowitz,* for example, the plaintiff produced evidence that in retaliation for her protected activity, her employer engaged in a "campaign" of retaliation. Reversing a grant of summary judgment to the employer, the court held, "These actions constituted more than mere inconveniences or insignificant changes in job responsibilities. Months of unwarranted and public criticism of a *previously honored* employee, an implied threat of termination, contacts with subordinates that only could have the effect of undermining a manager's effectiveness, and new regulation of the manner in which the manager oversaw her territory did more than inconvenience Yanowitz. Such actions, which for the purposes of this discussion we must assume were unjustified and were meant to punish Yanowitz for her failure to carry out her supervisor's order, placed her career in jeopardy." (*Id.* at p. 1060.)

*Causal Link*

■ It is not enough that the plaintiff prove an employment decision has a substantial and detrimental effect on the terms and conditions of his or her employment. The employee also must show that the decision is linked to the employee's protected activity. For purposes of making a prima facie showing, the causal link element may be established by an inference derived from circumstantial evidence. A plaintiff can satisfy his or her initial burden under the test by producing evidence of nothing more than the employer's knowledge that the employee engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision. (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69 [105 Cal.Rptr.2d 652] (*Morgan*).)

Such evidence, however, only satisfies the plaintiff's initial burden. "Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ' " 'drops out of the picture,' " ' and the burden shifts back to the employee to prove intentional retaliation. [Citation.]" (*Yanowitz, supra,* 36 Cal.4th at p. 1042.) The plaintiff must have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. The plaintiff's burden is to prove, by competent evidence, that the employer's proffered justification is mere pretext; i.e., that the presumptively valid reason for the employer's action was in fact a coverup. (*Ibid.*) In responding to the employer's showing of a legitimate reason for the complained-of action, the

plaintiff cannot " 'simply show the employer's decision was wrong, mistaken, or unwise. Rather, the employee " 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for the [. . . asserted] non-discriminatory reasons." [Citations.]' [Citations. ]" [Citation.]' [Citation.]" (*Morgan, supra,* 88 Cal.App.4th at p. 75.) "The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 356 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

## ANALYSIS

Actions for unlawful discrimination and retaliation are inherently fact-driven, and we recognize that it is the jury, and not the appellate court, that is charged with the obligation of determining the facts. Nonetheless, the jury's verdict stands only if it is supported by substantial evidence. "In determining whether a judgment is supported by substantial evidence, we may not confine our consideration to isolated bits of evidence, but must view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court. [Citation.] We may not substitute our view of the correct findings for those of the trial court [or jury]; rather, we must accept any reasonable interpretation of the evidence which supports the [factfinder's] decision. However, we may not defer to that decision entirely. '[I]f the word "substantial" means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' [Citations.]

"Although each case must be judged for sufficient evidence on its own peculiar circumstances, a number of general guidelines may be set forth. First, a judgment may be supported by inference, but the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork. [Citation.] Thus, an inference cannot stand if it is unreasonable when viewed in light of the whole record. [Citation.] And although an appellate court will normally defer to the trier of fact's drawing of inferences, it has been said: 'To these well settled rules there is a common sense limited exception which is aimed at preventing the trier of the facts from running away with the case. This limited exception is that the trier of the facts may not indulge in the inference when that inference is rebutted by clear, positive and uncontradicted evidence of such a nature that it is not subject to doubt in the minds of reasonable men.

The trier of the facts may not believe impossibilities.' [Citations.]" (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203–1204 [52 Cal.Rptr.2d 518].)

■ Applying these rules here, we conclude that the jury's verdict is not supported by substantial evidence. Our conclusion is based in part on our finding that what Dr. McRae contended was a continuous course of conduct was in fact a series of events, each bearing little relationship to the others, and at least some of which clearly were not the result of unlawful retaliation. We also find that much of which Dr. McRae complains, whether considered piecemeal or as part of a continuous course of conduct, does not and cannot rise to the level of an actionable adverse action. Finally, we find that the Department stated valid, nondiscriminatory reasons for its actions, and that Dr. McRae did not meet her burden of establishing that the Department's asserted reasons were pretextual.

The "continuous course of conduct" cannot include either Dr. Bick's request for an investigation or the confrontation with the nurses, as Dr. McRae made no showing whatsoever that either was triggered by an intent to retaliate. To the contrary, it is undisputed that the nurses acted because Dr. McRae disabled the air filter. Dr. McRae's own theory of Dr. Bick's complaint was that Dr. Bick sought to cover up his own negligence by leveling accusations at Dr. McRae; not that he sought to retaliate against her for complaining about the hiring decisions at Solano Prison.

The evidence also does not support Dr. McRae's assertion that the various actions taken against her were part of a process of "progressive discipline" beginning with counseling, then a written warning and then an adverse action. Under this view, Dr. Andreasen's attempts to meet with Dr. McRae were the first step, the letter of instruction was the second step and the third step was the decision to suspend or the transfer. The Department did not decide to suspend or transfer Dr. McRae because she failed to address the points made in the letter of instruction. Indeed, there is no evidence that she either did or did not address those issues. The decision to suspend or transfer was based on the investigation and the confrontation with the nurses, events outside of the "progression" identified by Dr. McRae. It is true that the letter was cited in the report of the administrative analyst who reviewed Dr. McRae's case and found that a 30-day suspension would be an acceptable penalty. It was not, however, cited in support of that finding, or in support of any decision to take action against Dr. McRae, but as part of Dr. McRae's work history, which also noted that there had been no prior adverse actions taken against her and her most recent performance evaluation had an overall rating of "outstanding" and a rating of "standard" in relationships with people.

Dr. McRae attempted to tie the complained-of actions together by asserting that they were all in some way engineered or furthered by Dr. Andreasen as part of his plan to discredit and injure her. For example, in connection with the investigation, she theorized that Dr. Bick had acted negligently in connection with the patient, and Dr. Andreasen then appointed an investigator who would make Dr. McRae look bad in order to protect Dr. Bick. Dr. McRae produced no direct evidence that Dr. Andreasen appointed the investigator or had any involvement in the manner in which the investigation was conducted. She produced no evidence, other than her own theory, that Dr. Bick needed protection, and no evidence that the investigator had any belief that Dr. Bick needed protection. Her theory is based on the unwarranted assumption that Dr. Bick's dereliction of duty, if any, would be ignored if it was concluded that Dr. McRae had acted improperly. It does not explain why Dr. Bick would have requested an investigation that might draw attention to his own negligence. It assumes that Dr. Andreasen—who simply added Dr. Bick's allegations to his own in requesting the investigation—had divined that Dr. Bick would need protection and, taking advantage of the situation, chose an investigator who would provide that protection by discrediting Dr. McRae. The evidence is too thin and too speculative to support such a theory, particularly when it is considered that Dr. Andreasen is supposed to have engaged in such a complicated and uncertain course of conduct in order to punish Dr. McRae for complaining about discrimination at another institution. Similarly, Dr. McRae's argument that Dr. Andreasen effectively caused the 30-day suspension is drawn from evidence that as CMO and acting chief deputy, Dr. Andreasen had the power to appoint persons to conduct investigations, and also had the power to recommend what form an adverse action might take. There is no direct evidence that Dr. Andreasen made any recommendations to his superiors, or that his recommendation was or would be adopted without independent analysis or question.

█ This case also differs in significant ways from *Yanowitz*, where the court concluded that a claim of adverse action may be based on a continuous course of conduct. In *Yanowitz*, all of the allegedly wrongful acts were engaged in by the plaintiff's immediate supervisor and his supervisor, and all were taken in response to a single protected act by the plaintiff. Here, the allegedly wrongful acts were taken by many different persons, for different reasons, some of which indisputably had nothing to do with Dr. McRae's protected conduct. In *Yanowitz*, the several actions taken against the plaintiff created a hostile or abusive work environment for her. The court, citing *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21–23 [126 L.Ed.2d 295, 114 S.Ct. 367] found, " 'When the workplace is permeated with "discriminatory intimidation, ridicule, and insult" [citation] that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" [the law] is violated.' " (*Yanowitz, supra,* 36

Cal.4th at pp. 1052–1053.) Here, while Dr. McRae complained that the Department's conduct was unwarranted, she made no showing that the events leading up to and including the letter of instruction and the investigation forced her to work in an abusive working environment or that her supervisors sought to humiliate or demean her.

Dr. Andreasen's memoranda to his files and the letter of instruction, in and of themselves, do not rise to the level of an adverse employment action. None had any effect on the terms and conditions of Dr. McRae's employment except to require Dr. McRae to remain at her post. While the memoranda and letter of instruction properly may be considered in deciding whether the Department engaged in a course of conduct that altered the terms or conditions of employment, there is no merit to Dr. McRae's contention that they are themselves adverse actions because they might later be cited as part of the reason for an employment decision. (Contrast *Akers, supra,* 95 Cal.App.4th at pp. 1456–1457, where the court found that a performance evaluation and counseling memorandum amounted to an adverse action because they had the effect of making the plaintiff "unpromotable.") There is no evidence that the Department would, or was likely to, deny employment benefits or privileges to an employee who had received a letter of instruction. Finally, neither the memoranda nor the letter, or both, created a hostile work environment. All were private. There is no evidence that Dr. McRae was aware of the memoranda to Dr. Andreasen's files. There is no evidence that Dr. Andreasen delivered the letter of instruction in an abusive or demeaning manner. Similarly, the investigation itself, irrespective of the reasons for its initiation or its outcome, made no material change in the terms or conditions of Dr. McRae's employment. The confrontation with the nurses, although unquestionably very unpleasant, was a single instance of offensive conduct that cannot properly be viewed as materially affecting the terms and conditions or privileges of employment (*Yanowitz, supra,* 36 Cal.4th at p. 1054) even if the confrontation was in some manner tied to Dr. McRae's protected activity.

The 30-day suspension certainly would have been a material change in the terms and conditions of Dr. McRae's employment, but Dr. McRae was not suspended for 30 days, or at all. Instead, she was transferred to Solano Prison. Dr. McRae, without record citation, asserts that the unimplemented decision to suspend was placed in her permanent files, suggesting that it would be used against her in the future. She did not show that the unimplemented decision was a career ender or that it would provide a basis for denying her some future employment opportunity. To the contrary, the fact that the Department chose to transfer her rather than discipline her suggests that it decided that a better approach was to transfer Dr. McRae away from CMF and allow her the opportunity to thrive in another institution. Under the

circumstances here, the investigation and decision were not themselves actionable, but were intermediate steps that led to the transfer.

■ A transfer can be an adverse employment action when it results in substantial and tangible harm. A transfer is not an adverse employment action when it is into a comparable position that does not result in substantial and tangible harm. (*Akers, supra,* 95 Cal.App.4th at p. 1457; and see *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1389–1390 [37 Cal.Rptr.3d 113].) A transfer is not an adverse action simply because the plaintiff finds it to be "personally humiliating." (*Flaherty v. Gas Research Institute* (7th Cir. 1994) 31 F.3d 451, 457, cited in *Yanowitz, supra,* 36 Cal.4th at p. 1054, fn. 13.) The District of Columbia Circuit, in *Brown v. Brody* (D.C. Cir. 1999) 339 U.S. App.D.C. 233 [199 F.3d 446], after surveying the relevant case law, stated a formulation that reflects our own view: "[A] plaintiff who is made to undertake or who is denied a lateral transfer—that is, one in which she suffers no diminution in pay or benefits—does not suffer an actionable injury unless there are some other materially adverse consequences . . . such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm. Mere idiosyncrasies of personal preference are not sufficient to state an injury." (*Id.* at p. 457.)

The transfer of Dr. McRae from CMF to Solano Prison did not entail a demotion, reduction in pay or a loss of benefits. It did not involve a change in status or a less distinguished title. There is no evidence that it involved any significant change in job responsibilities, or, except for on-call duty, in work hours or commute time. Dr. McRae nonetheless contended that the transfer was an adverse employment action, asserting that she was aware that Solano Prison had a reputation among physicians as one of the worst facilities in the system, and that physicians were sent there before they were dismissed. While Dr. McRae stated her personal beliefs, she produced no evidence that Solano Prison in fact had a poor reputation or that the Department routinely sent physicians there as a step towards dismissal.

Dr. McRae also complained that she had been unable to get a lab coat at Solano Prison, and had to wear a paper gown to keep her clothing clean. Dr. McRae had her own desk while working at CMF, but claimed she had no desk or specific workplace at Solano Prison, and sometimes had to use a stand ordinarily used to hold medical instruments. Dr. McRae's complaints are made somewhat less significant by the fact that she worked at Solano Prison for fewer than three weeks, so that it is not particularly surprising that the details of her work environment were imperfect or unsettled.

There is little question but that the lack of a lab coat or the need to share a desk would be inconvenient and irritating. On the other hand, work at CMF

exposed Dr. McRae to the HEPA filter and to two nurses against whom she had sought a restraining order, and required her to work under a supervisor she felt did not support her. In all events, matters such as the lack of a lab coat or a desk do not compare in significance to matters such as demotions, loss of pay or benefits, public humiliation, or harassment in the workplace. In short, they do not amount to a tangible injury supporting a claim of adverse employment action.

Dr. McRae also complained of the differences in on-call duty required by CMF and Solano Prison. At CMF, Dr. McRae was required to spend two to four nights per month at the hospital on MOD duty, and sought an exemption from that duty. There is no MOD duty at Solano Prison, but physicians are required to be on-call at that facility for a full week at a time, meaning that they are scheduled to cover night calls and, if necessary, to go in. Dr. McRae claimed that physicians on this duty had to be within a 30-minute response of the institution. As she lived more than 30 minutes away, Dr. McRae asserted that she would have to move out of her home for about a week, live in a motel, eat in restaurants and arrange for the care of her dog, and would have to bear the expense of these items.

Dr. McRae produced no evidence of an order or policy requiring on-call physicians to arrive at the facility within 30 minutes of a call. She also produced no evidence that any Solano Prison physician actually had moved out of his or her home during the week of on-call duty, or that there had been any complaints that a physician had failed to arrive at the facility within 30 minutes of being called. As evidence supporting her claim, Dr. McRae cites her own testimony, where she stated her belief that on-call physicians had to be within a 30-minute response time of the institution. Dr. McRae explained, further, "I don't recall specifically who told me that, but I think it was Dr. Ziesma [who, Dr. McRae stated, was in a supervisory position]. I believe the other doctors may have said it, too, but the response time for emergencies was 30 minutes. It may have been even less than that, but I don't think it was more than 30 minutes. . . . If there was an emergency at the facility, the physician on duty had to get there within 30 minutes was my understanding."

Dr. McRae also cites the collective bargaining agreement between the State of California and the Union of American Physicians and Dentists. As relevant, the agreement provided that the on-call assignment was a work shift of seven consecutive days in which the employee is available by telephone or electronic paging device at all times, and "normally immediately available to return to the facility." Employees would be entitled to pay for every hour actually worked plus one hour for travel time.

Dr. McRae's opinion, or even the opinion of a supervising physician, has no probative value absent a showing that the opinion is based on fact. The

collective bargaining agreement, by requiring that the employee be "immediately available to return to the facility," suggests only that the employee must be prepared to drop whatever he or she might be doing, and return. That an employee will be paid for no less and no more than one hour of travel time is not the same thing as a mandate that the employee be within 30 minutes of the facility.

The Department introduced evidence that Dr. McRae's beliefs were unfounded. Ms. Clayton, the Department's northern regional health service administrator, who also had been the labor liaison from 1994 until 1999, and was the person who dealt with collective bargaining issues, testified that there was no requirement that an on-call physician had to be within 30 minutes of the facility. She explained that on-call duty at Solano Prison meant that nursing staff would contact the on-call physician if there were an emergency, if staff needed to receive orders about a patient or it was necessary for the physician to come in. Most of the facility's physicians lived out of the area. Most of the time they would not come in, instead making telephonic orders. Unlike CMF, Solano Prison was not licensed for acute care, so a physician would not need to return even if a serious emergency arose. The physician instead would order the patient sent to another facility. The evidence, therefore, does not support Dr. McRae's assertion of having to be within 30 minutes of Solano Prison during periods of on-call duty.

Dr. McRae also complained that Solano Prison provided a more dangerous work setting than CMF. Neither side produced much evidence on the relative safety of either facility, and Dr. McRae's stated concerns about safety are somewhat undermined by the fact that she actively sought employment at Solano Prison. Both facilities house prisoners, and both facilities, therefore, have safety issues, but what little record evidence there is on the subject suggests that CMF presented the more dangerous environment. CMF houses inmates at all levels, including those at level 4, who are considered to be more dangerous than the general prison population. CMF also provides secured housing units for inmates who have been segregated from the general population because of their violent propensities. Solano Prison, in contrast, houses level 2 and 3 inmates, who are considered to be only medium custody inmates. Solano Prison, which was built more recently than CMF, has gun towers and an observation area in the housing unit facing the yard, both of which are manned by armed correctional officers. There is an armed entryway into the prison. There is no similar protection for staff at CMF. Ms. Clayton explained: "Solano has more visible uniform staff than . . . CMF. CMF is a closed quarter, which is maybe the width of this room, maybe a little wider, where you have staff and inmates who are in the same general area. The only protection for staff is that they have—they are supposed to walk in this marked off area, which is in the center corridor, which is white lines in the center of the corridor, and the staff are to walk within that area, and that is

supposed to be their protection there at CMF." This evidence does not establish, or even allow an inference, that Solano Prison provides a more dangerous environment than CMF. To the contrary, the evidence supports the conclusion that Solano Prison provides a safer work environment than the environment at CMF.

Dr. McRae testified that she felt fear for her safety because she believed she lacked the support and protection of the administration. This was based, in part, on her experience at CMF, and, in part on the failure to provide her with an orientation after she began working at Solano Prison. Dr. McRae explained that an orientation would have dealt with safety issues, including "[w]hat areas you may and may not walk into; what it means when there is a yard down; what kind of special rules are in effect for employees at that particular facility to ensure [their] safety." Dr. McRae testified, further, that she had received information that an orientation was very important and that it was to take place quite soon after a person came on duty. When she complained that she had not had an orientation, she was told, simply, that one would be scheduled. Dr. McRae explained that she had concluded that the administration at Solano Prison would not support her because it had failed to provide her with a lab coat and a desk and there had been a complaint about her use of the common workspace.

Again, Dr. McRae's personal beliefs or concerns are not evidence. The evidence is that CMF and Solano Prison do not share administrations. That Dr. McRae was not supported at CMF, therefore, would not mean that she would lack support at Solano Prison. As Dr. McRae was transferred *from* CMF *to* Solano Prison, she was transferred *away* from employees and administration she believed to be hostile to her. In addition, even if Dr. McRae's troubles at CMF meant that she would lack support at Solano Prison, her complaint does not support a claim that the *transfer* compromised her safety, at least in the absence of some evidence that Solano Prison was in fact a more dangerous environment so that the lack of support would be felt more acutely.

As to the orientation, Dr. McRae was at Solano Prison for only two and one-half weeks. Ms. Clayton, although testifying that orientations were given to employees as soon as possible after they reported to work, also testified that orientations generally were given once a month. In the meantime, employees received on-the-job training. Ms. Clayton explained that the purpose of an orientation was to familiarize the employee with the setting and explain how to function within it, including how to work safely. Dr. McRae, who had worked for six years at CMF, was already familiar with most of these things. Dr. McRae produced no evidence contradicting Ms. Clayton's

testimony. The evidence, therefore, does not establish either that Dr. McRae was denied an orientation, or that the failure to provide her with one rendered the job unsafe.

In sum, substantial evidence does not support a finding that the transfer of Dr. McRae from CMF to Solano Prison amounted to an adverse employment action.

Finally, the Department proffered a compelling reason for transferring Dr. McRae to Solano Prison. Her relationship with other CMF employees had so deteriorated that she had sought a restraining order against two nurses, had taken nonindustrial leave, and had not returned to work until nearly a year later. Dr. McRae also had expressed unhappiness with MOD duty, and was concerned that working in proximity to the HEPA filter endangered her health. Under those circumstances, the decision to transfer Dr. McRae into a new work environment had every appearance of being a reasonable management decision. The burden, therefore, shifted to Dr. McRae to produce competent evidence that the Department's proffered reason for the transfer was pretextual, by demonstrating such weaknesses, implausiblities, inconsistencies, incoherencies, or contradictions as to allow the jury to find it unworthy of credence. (*Morgan*, *supra*, 88 Cal.App.4th at p. 75.)

Dr. McRae did not meet that burden. She made no showing that the Department routinely, or indeed ever, punished persons for filing FEHA complaints by transferring them to other, less favorable assignments. She did not, and could not, show that the Department had no legitimate reason for her transfer. Her argument, rather, focused on her claim that the Department should have taken some other action to alleviate her problems at CMF, such as by disciplining or transferring the two nurses, and, presumably, disciplining or transferring Dr. Andreasen, and possibly Dr. Bick. That some other action might also have addressed the Department's concerns does not establish that the Department's stated reasons for the transfer were pretextual, particularly when the other action would have created its own set of problems or would have provided cause for complaint by other employees. Here, for instance, the nurses would have had reason to complain that they were transferred as a result of attempting to secure a safe work environment.

We therefore also conclude that Dr. McRae did not sustain her burden of demonstrating that the decision to transfer her was the result of a wish to retaliate against her for filing grievances, as opposed to the wish to remove her from an environment where she could not function effectively.

At oral argument, counsel for Dr. McRae relied on *Begnal v. Canfield & Associates, Inc.* (2000) 78 Cal.App.4th 66 [92 Cal.Rptr.2d 611] (*Begnal*), a

recent employment discrimination case decided by this court, to support his argument that the judgment must be affirmed because the jury could reasonably infer the ultimate fact of retaliatory motive by discrediting the defendants' stated reasons for their adverse employment actions. (*Id.* at p. 77.) In *Begnal*, plaintiff McKenzie proved that the stated reasons for her termination were false, and presented other evidence that her termination was based on age discrimination. This evidence, which we found substantial, included the testimony of an expert statistician that Canfield Associates had a significantly higher discharge rate for older employees, the fact that most of its new hires after McKenzie was terminated were substantially younger, and a statement by Dave Canfield, the owner of the company, that he wanted younger people doing McKenzie's job. (*Id.* at p. 71.) As our analysis of the evidence in this case shows, Dr. McRae testified that she believed the adverse employment actions taken by defendants were motivated by an intent to retaliate against her for filing an employment discrimination claim against them. In response to defendants' evidence of a nonretaliatory motive for their actions, Dr. McRae reiterated her belief that their actions were so motivated and then argued that defendants' explanations were pretextual.

In *Begnal, supra*, 78 Cal.App.4th, as in this case, "our role is not to weigh the evidence, but rather to determine whether any substantial evidence supported the jury verdict." (*Id.* at pp. 77–78.) Giving full credence to Dr. McRae's testimony, all that it proved was her belief that the defendants had retaliated against her and were lying about their motivation; however, to sustain a judgment in an employer retaliation case the plaintiff must produce substantial evidence from which the jury can find that defendants' reasons for their actions are false or pretextual. Dr. McRae's beliefs are not substantial evidence of defendants' motivation.

### CONCLUSION

In conclusion, the jury's finding that Dr. McRae had been subjected to an adverse action is not supported by the evidence. The other actions, whether viewed separately or collectively, did not amount to adverse actions. They were not part of a process of progressive discipline, and they did not create an abusive work environment. Finally, assuming for purposes of argument that the transfer resulted in a material change in the terms and conditions of Dr. McRae's employment, Dr. McRae did not produce substantial evidence from which the jury could conclude that the Department's legitimate reasons for the transfer were mere pretexts unworthy of credence.

The judgment, therefore, is reversed.

The orders awarding Dr. McRae postjudgment and prejudgment attorney fees are reversed.

The order awarding costs to the individual defendants is affirmed. The matter is remanded to the trial court to award costs to the Department, to the extent that those costs are not duplicative of costs already awarded to the individual defendants.

Defendants are awarded their costs on appeal.

Swager, J., and Margulies, J., concurred.

A petition for a rehearing was denied September 28, 2006, and the petition of respondent Margie McRae for review by the Supreme Court was denied December 13, 2006, S147189.