Filed 8/29/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JAMES THOMAS JEFFRA, | B292775 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC683021) |
| v. | |
| CALIFORNIA STATE LOTTERY, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Susan Bryant-Deason, Judge. Affirmed.

Xavier Becerra, Attorney General, Chris A. Knudsen, Senior Assistant Attorney General, Kenneth C. Jones, Supervising Deputy Attorney General, and Nancy James, Deputy Attorney General, for Defendant and Appellant.

Santiago & Jones, David G. Jones and Alex V. Vo for Plaintiff and Respondent.

———————————————

**SUMMARY**

Plaintiff James Thomas Jeffra was an investigator employed by defendant California State Lottery. He sued defendant, alleging retaliation in violation of the California Whistleblower Protection Act. (Gov. Code, § 8547.8, subd. (c).) He alleged defendant engaged in a pretextual investigation, ultimately forcing him to retire, after he filed a whistleblower complaint with the California State Auditor.

Defendant filed an anti-SLAPP (strategic lawsuit against public participation) motion to strike the complaint (Code Civ. Proc., § 425.16), contending the complaint arose from protected activity, namely, defendant's investigation of possible misconduct by plaintiff. The trial court denied the motion, finding the complaint arose "from non-protected retaliation, not protected investigations."

After plaintiff's ensuing appeal was briefed, the California Supreme Court decided *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871 (*Wilson*). In *Wilson,* the court disapproved the precedent on which the trial court here relied, and held that retaliation claims "arise from the adverse actions allegedly taken" – here, the investigation – "notwithstanding the plaintiff's allegation that the actions were taken for an improper purpose." (*Id.* at p. 892.) We conclude, consistent with *Wilson*, that plaintiff's complaint arose from protected activity.

The trial court did not consider whether plaintiff had established a probability of prevailing on the merits of his claim. Giving "careful attention to the limited nature of a plaintiff's second-step showing" (*Wilson, supra,* 7 Cal.5th at p. 892), we conclude plaintiff has made the necessary showing.

Consequently, we affirm the trial court's order denying the anti-SLAPP motion.

## FACTS

### 1.    Plaintiff's Complaint and Declaration

Plaintiff was hired by defendant as a Lottery Investigator in October 2011.  His duties included investigating complaints and allegations of administrative misconduct of Lottery ticket retailers, claimants, distributors, suppliers, and contractors to the Lottery.  Until November 2016, when he was placed on "administrative time off," his performance was exemplary.

Plaintiff alleges that from 2013 through 2016, he reported to his superiors that prizes were paid to claimants of winning Lottery tickets who did not provide substantial proof that they were the genuine owners of the winning tickets.  He also reported fraud among retailers of Lottery tickets and their employees, such as narrowly scratching tickets to see if they were winners and, if not, selling them to unsuspecting members of the public; and widespread theft of tickets.  He also reported defendant had inadequate systems to prevent fraud.  Some superiors, in effect, told him to stay quiet because sales were good.

Plaintiff made a telephonic whistleblower report in April 2016.  He and investigator Gary Galbreath made a joint written report in late September 2016.  They appended to their report copies of documents they had created or obtained in the course of their duties.  They only provided the documents to the Auditor's office, and to no one else.

On November 14, 2016, Kelly Dixon, the special assistant to the deputy director of the Security/Law Enforcement Division (for which plaintiff worked) told plaintiff he was being put on administrative leave.  Plaintiff was required to turn in his

equipment and peace officer credentials and was escorted off the premises. He was interrogated by Mr. Dixon on November 17, including about his whistleblower complaint – which he had not told anyone about. He was later told he would lose pension and health benefits if he was terminated while on administrative leave. He knew of two former coworkers who had been terminated after submitting whistleblower complaints within the previous year. So he retired.

The complaint alleged defendant's actions were "solely based on retaliation because of Plaintiff's protected conduct," and the reasons given for the investigation and for placing him on administrative time off were "wholly pretextual."

## 2. Defendant's Anti-SLAPP Motion

Defendant filed an anti-SLAPP motion, including a declaration from James Libby, an assistant chief with the California Highway Patrol, who was assigned to perform the duties of deputy director of the Lottery's Security/Law Enforcement Division. (The parties refer to this division as SLED.) Mr. Libby was the chief law enforcement officer for the Lottery, and oversaw a staff that included plaintiff. Among many other duties, he was charged with "investigating employee misconduct when I became aware of possible misconduct."

Mr. Libby explained that, when questions arise about a claim for Lottery winnings, an investigator is assigned to investigate the claim. The investigator's report includes confidential information, such as a claimant's name, address, phone number, date of birth, social security number, and so on. The investigation files are kept confidential, accessible only to investigative and legal staff on a need to know basis.

4

In late October 2016, Mr. Libby saw an advertisement promoting an investigative report scheduled to air on a CBS television affiliate on October 27 and October 28. The advertisement indicated the reporter (David Goldstein) was looking into payments made to a specific Lottery winner whose claim was not accessible to investigators for various reasons.

The promotion for the CBS show indicated that Lottery insiders were giving confidential information to Mr. Goldstein. Mr. Libby testified he had a duty to investigate the potentially criminal disclosure of confidential information.

Before the Goldstein investigative report was broadcast, Mr. Libby began an investigation to determine who was releasing confidential information from the Lottery. The investigation revealed that plaintiff and two other Lottery employees had viewed two files they were not authorized to access and printed copies of confidential reports.

On October 31, 2016, Mr. Libby initiated a formal administrative investigation into potential misconduct by plaintiff to determine whether he had committed misconduct by accessing investigative files without authority and/or disseminating confidential information.

On November 10, 2016, Mr. Libby issued a memorandum to plaintiff notifying him that "he would be the subject of a formal administrative interrogation on November 17, 2016."

On November 14, 2016, defendant notified plaintiff it was placing him on "Administrative Time Off" pending its investigation, which was standard procedure "when there are concerns that misconduct could continue, or that the investigation could be compromised, if the employee remains in the workplace."

On November 16, 2016, Manuel Ortiz, plaintiff's supervisor, received a package from plaintiff "containing separation documents and advising that he intended to retire," with November 26, 2016 as his last day on the payroll.

Also on November 16, 2016, another investigator, Mr. Galbreath, was interviewed "in connection with the investigation into [plaintiff's] possible misconduct." Plaintiff was interviewed the following day, November 17. Following one or both of these interviews, Mr. Libby "was notified by the interviewer that [plaintiff] and the other employee revealed in their administrative interviews that they had submitted a joint whistleblower complaint to the California State Auditor. This was the first I learned that either [plaintiff] or the other employee had filed any sort of whistleblower complaint."

### 3. Plaintiff's Opposition

Plaintiff submitted several declarations in opposition to defendant's anti-SLAPP motion, including his own.

In addition to facts already recounted, plaintiff described his work investigating "numerous instances of theft and embezzlement of Lottery 'scratchers' tickets, often in amounts exceeding $100,000." He learned these crimes "were made possible by flaws in the Lottery's Retailer Compliance Program." He stated that "throughout the years 2013 through 2016, I notified my direct supervisors about my findings and apprised them of the widespread fraud I have observed upon bona fide Lottery ticket purchasers, the Lottery, and the state of California, as well as the inadequacies I had observed in the Lottery's Retailer Compliance Program that enabled such fraud and theft to go on without detection." He described his findings

6

in detail, and identified some of his superiors to whom he reported the concerns he described.

On April 16, 2016, plaintiff submitted a telephonic whistleblower complaint to the Auditor. He "reported the . . . flaws in the Lottery's Retailer Compliance Program as well as the Lottery's failure to implement notification systems to flag and apprise investigators in advance of suspicious transactions and activities. In reporting the Lottery's failure to employ sufficient oversight and safeguards to prevent theft and embezzlement of scratchers tickets," plaintiff identified two specific cases "whereby scratchers tickets retailers or their employees were able to abscond with approximately $123,000 and $270,000 worth of tickets . . . months before the Lottery even became suspicious and began to investigate." He reported that defendant uses notification systems for its other games, but not for scratchers tickets, and he "apprised the Bureau of the statements I had received from other Lottery[] supervisors and staff indicating that the Lottery was more concerned about sales of Lottery tickets than with preventing fraud."

Also in April 2016, plaintiff met with Mr. Libby, Mr. Ortiz, and two fellow investigators. The investigators voiced their concerns, but Mr. Libby "was not receptive to our concerns. Instead, Deputy Director Libby stated, 'we are corporate security with police powers,' and that there is 'shrinkage in all corporations.' I understood Deputy Director Libby's statements to imply that if we [the three investigators] continued to voice our concerns about the Lottery's investigatory practices, we would be subject to termination." Plaintiff stated Mr. Libby "responded flippantly to our concerns that we were being hindered in effectuating investigations and arrests," and plaintiff understood

7

another comment Mr. Libby made "to mean that SLED [the enforcement division] did not take our concerns seriously and that we were being warned to stop voicing our concerns and disagreements with the Lottery's investigatory practices."

In late September 2016, "investigator Gary Galbreath and I prepared and submitted a detailed joint whistleblower complaint, signed by both Galbreath and I, to the California State Auditor describing all of the above matters. The joint whistleblower complaint also addressed issues regarding: (1) the Lottery's payment of prizes to unqualified persons despite investigators' findings and recommendations to the contrary; (2) the Lottery's failure to address widespread 'pinning,' an illegal practice whereby Lottery ticket retailers apply small scratches to scratchers tickets to determine their value and then knowingly sell losing tickets to unknowing buyers while keeping winning tickets for themselves; (3) the Lottery's failure to address widespread theft of Lottery tickets by unscrupulous retailers; and (4) the Lottery's reluctance to penalize repeat violators of Lottery rules and regulations and its reluctance to authorize investigators to investigate such persons and activities."

"Per the request of the California State Auditor, investigator Galbreath and I included with our whistleblower complaint various investigative reports we had authored or obtained in the course of our duties, which we believed evidenced ongoing failure by the Lottery to follow the law in awarding prizes to claimants. The information accessed and obtained by investigator Galbreath and I was obtained solely for the purpose of submission to the California State Auditor and we did not forward or share any of the information with any other persons or entities."

Plaintiff was interrogated on November 17, 2016, by Special Assistant Dixon. "Among the matters that I was interrogated on were the contents and the grounds for the contentions made in the whistleblower complaint . . . . Prior to this time, I had not spoken to anyone or otherwise made the existence of the whistleblower complaint known to anyone other than Gary Galbreath and the office of the California State Auditor."

Plaintiff's declaration stated his understanding that there had still been no resolution of the allegations he misused the Lottery's information technology resources, and that his personnel records reflect "that my employment with the Lottery ended while I was still under investigation, which will effectively bar me from future employment in law enforcement."

Plaintiff explained he was advised that he risked losing significant pension and health benefits if he were terminated while under investigation or if the investigation resulted in an adverse finding. He was also aware that two other investigators, former chief investigator Helen Brean and former deputy director Stephen Tacchini, "had previously made complaints similar to the ones investigator Galbreath and I had made and were terminated soon afterwards." Plaintiff described the circumstances of those terminations. In Ms. Brean's case, after investigating and recommending denial of a claim, defendant disregarded her report and granted the prize to the claimant. Shortly after she filed a whistleblower complaint on the matter, Ms. Brean was terminated. Her ensuing lawsuit was settled; plaintiff included a copy of her complaint with his declaration.

Plaintiff's declaration concluded:

"Because of the humiliating treatment that I was subjected to during the interrogation, the fact that the interrogation was based largely on the contents of my whistleblower complaint, a clear pattern by the Lottery in terminating those who report concerns of waste, abuse, and fraud, and . . . the indefinite nature of the compulsory leave that I was placed on, it was apparent to me that there was a concerted effort by the Lottery to intimidate both me and investigator Galbreath and to fabricate reasons for terminating us."  Plaintiff was fearful of being terminated and losing the pension and health benefits that "my wife and I both need in order to survive."  Because of the "inordinate amount of stress and anxiety," plaintiff "saw no other option but to retire prior to my intended retirement age and I did so, reluctantly, in the end of November of 2016."

Plaintiff also submitted a declaration from Mr. Galbreath, the investigator who filed the joint whistleblower complaint with plaintiff.  Mr. Galbreath largely corroborated plaintiff's testimony.  Their whistleblower complaint "implicated Deputy Director James Libby . . . and others as being either complicit in the conduct alleged in the complaint or negligent in their duty to enforce Lottery rules and regulations."

Mr. Galbreath stated that until he was interrogated by Mr. Dixon, "I did not discuss or otherwise make known the existence of the joint whistleblower complaint to anyone other than [plaintiff] and the office of the California State Auditor."

Mr. Galbreath stated that, "[t]o my surprise, Kelly Dixon presented me during the interrogation with a copy of the first page of the whistleblower complaint" he and plaintiff had submitted in September 2016.  He was "baffled that Mr. Dixon

10

would have this document since I had never provided or even discussed any portion of it with anyone other than [plaintiff] and the office of the . . . Auditor." According to Mr. Galbreath, Mr. Dixon said "that he found it on the desk of another former . . . investigator, Robin Chan" on November 14, 2016.

Mr. Galbreath found this explanation "unbelievable," because neither he nor plaintiff had provided the whistleblower complaint to anyone but the Auditor; he knew of no involvement by Mr. Chan with the Auditor's office; and Mr. Chan had been terminated from the enforcement division approximately six months before he and plaintiff were suspended, "and would therefore not have had any access or reason to be in any of [the division's] offices." Further, Mr. Galbreath physically drafted the complaint, and never worked on it on any of the computers in the division's offices. Mr. Galbreath stated it was clear to him that Mr. Dixon was aware of the contents of the joint whistleblower complaint "in advance of both the interrogation and the investigation," as Mr. Dixon "proceeded to interrogate me on the contents of the complaint, as he questioned the propriety of me and [plaintiff] submitting specific information to the California State Auditor, and as he repeatedly challenged the grounds for the specific contentions made in the whistleblower complaint."

Mr. Galbreath was terminated from his employment as an investigator in April 2017.

Plaintiff's opposition included copies of the transcripts of the interrogations of plaintiff and Mr. Galbreath.

4. **The Trial Court's Ruling**

The court denied defendant's motion, concluding plaintiff's causes of action arose "from non-protected retaliation, not protected investigations." The court did not reach the question

11

whether plaintiff demonstrated a probability of prevailing on the merits of his retaliation claim.

Defendant filed a timely appeal of the court's ruling.

## DISCUSSION

The anti-SLAPP statute and procedures have been described many times.  A defendant may bring a special motion to strike any cause of action "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . ."  (Code Civ. Proc., § 425.16, subd. (b)(1) (section 425.16).)

When ruling on an anti-SLAPP motion, the trial court employs a two-step process.  The moving defendant bears the initial burden of establishing that the challenged allegations or claims " ' "aris[e] from" protected activity in which the defendant has engaged.  [Citations.]  If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit." ' [Citation.]  If the plaintiff fails to meet that burden, the court will strike the claim."  (*Wilson, supra,* 7 Cal.5th at p. 884.)  In making its determination, the trial court considers "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."  (§ 425.16, subd. (b)(2).)

Our review is de novo.  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

## 1.     The First Prong:  Protected Activity

As *Wilson* tells us, the defendant's first-step burden "is to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute.  A 'claim may be struck only if the speech or petitioning

12

activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.' " (*Wilson, supra,* 7 Cal.5th at p. 884.)  "To determine whether a claim arises from protected activity, courts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' " (*Ibid.*)  The court then evaluates "whether the defendant has shown any of these actions fall within one or more of the four categories of ' "act[s]" ' protected by the anti-SLAPP statute." (*Ibid.*)

In *Wilson,* the court decided a question that had created a "growing divide" in the courts of appeal.  (*Wilson, supra,* 7 Cal.5th at p. 883.)  *Wilson* concluded that "for anti-SLAPP purposes discrimination and retaliation claims arise from the adverse actions allegedly taken, notwithstanding the plaintiff's allegation that the actions were taken for an improper purpose. If conduct that supplies a necessary element of a claim is protected, the defendant's burden at the first step of the anti-SLAPP analysis has been carried, regardless of any alleged motivations that supply other elements of the claim."[1]  (*Id.* at p. 892.)

The principle stated in *Wilson* governs this case.

As *Wilson* also tells us, "[t]o prove unlawful retaliation, [plaintiff] must . . . show [defendant] subjected him to adverse employment actions for impermissible reasons – namely, because he exercised rights guaranteed him by law." (*Wilson, supra,*

---

[1]    The court disapproved *Nam v. Regents of University of California* (2016) 1 Cal.App.5th 1176 to the extent it was inconsistent with *Wilson*'s conclusion.  (*Wilson, supra,* 7 Cal.5th at p. 892.)

13

7 Cal.5th at p. 885.) Defendant points out that its investigation of plaintiff was the allegedly adverse employment action at the heart of plaintiff's complaint, and we cannot disagree: the investigation was the "wrong complained of" – the adverse action that supplies a necessary element of plaintiff's retaliation claim. And the other adverse actions (plaintiff's administrative leave and his forced retirement) are inextricably tied to the investigation; plaintiff could not omit reference to the investigation and still have a retaliation claim.

Thus, if plaintiff's complaint arises from the investigation – as it surely does, as that is the very wrong complained of – and if the investigation falls within one or more of the four categories of acts protected by the anti-SLAPP statute, defendant has satisfied its initial burden. That is the case here.

Defendant correctly asserts the investigation was protected activity under section 425.16, subdivision (e)(2) ("any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law"). The authorities support the proposition that an internal investigation by a state-created entity is an "official proceeding authorized by law." (See *Hansen v. Department of Corrections & Rehabilitation* (2008) 171 Cal.App.4th 1537, 1544 [state entity's internal investigation into allegations that the plaintiff had engaged in misconduct and criminal activity "itself was an official proceeding authorized by law"].) "Although [the plaintiff] was never formally charged with misconduct or a crime, communications preparatory to or in anticipation of the bringing of an official proceeding are within the protection of section 425.16." (*Id.* at p. 1544, citing

14

*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115.)

Plaintiff does not suggest otherwise, instead arguing only that "the 'protected' conduct on which [defendant] based its motion, i.e., its 'investigation,' was in fact a sham done in retaliation for the complaints made of waste, abuse and violations of law," and therefore was not activity protected under the anti-SLAPP statute. As we have seen, *Wilson* definitively rejects that view of the anti-SLAPP statute, refusing to "treat[] a plaintiff's allegations of illicit motive as a bar to anti-SLAPP protection." (*Wilson, supra,* 7 Cal.5th at p. 889.) Rather, defendant's allegedly impermissible reason for taking the adverse employment action is an issue plaintiff must raise and support at the second step of the analysis. (*Id.* at p. 888.) We turn to that issue now.

## 2. The Second Prong: Probability of Prevailing on the Merits

To prove unlawful retaliation, plaintiff must show defendant "subjected him to adverse employment actions for impermissible reasons – namely, because he exercised rights guaranteed him by law." (*Wilson, supra,* 7 Cal.5th at p. 885.) Here, that law is the Whistleblower Protection Act. Among other things, the act provides that "any person who intentionally engages in acts of reprisal, retaliation, threats, coercion, or similar acts against a state employee . . . for having made a protected disclosure shall be liable in an action for damages . . . by the injured party." (Gov. Code, § 8547.8, subd. (c).)

*Wilson* describes the plaintiff's burden. "[T]he plaintiff's second-step burden is a limited one. The plaintiff need not prove her case to the court [citation]; the bar sits lower, at a

15

demonstration of 'minimal merit' [citation].  At this stage, ' "[t]he court does not weigh evidence or resolve conflicting factual claims.  Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.  It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." ' "  (*Wilson, supra,* 7 Cal.5th at p. 891.)

Defendant contends plaintiff did not demonstrate the necessary minimal merit because, as a matter of law, there was no adverse employment action, and even if there were, plaintiff "cannot establish a causal link" between the adverse action and "his alleged whistleblowing activity."  We disagree.

First, it is not correct that defendant took no adverse action against plaintiff.  If plaintiff's evidence is believed, defendant subjected him to a pretextual investigation and, in the course of doing so, placed him on administrative leave, required him to surrender his equipment, stripped him of his peace officer status, and escorted him off the premises.  That the investigation was pretextual may be inferred from evidence that he was interrogated on "the contents and the grounds for the contentions made in the whistleblower complaint"; that Mr. Galbreath, too, was interrogated on the contents of the whistleblower complaint, and was also confronted with the first page of the complaint, with no plausible explanation of how defendant obtained it; and that two other investigators "had previously made complaints similar to the ones investigator Galbreath and [plaintiff] had made and were terminated soon afterwards."

Defendant does not acknowledge this evidence in its opening brief.  Defendant simply insists that an investigation is

16

not an adverse action, citing *McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 392-393 (*McRae*). *McRae* does not stand for that proposition. *McRae* reversed a jury award to the plaintiff on her retaliation claim, finding the verdict was not supported by substantial evidence. (*Id.* at p. 390.) Among several other deficiencies, the plaintiff did not meet her burden of establishing her employer's asserted reasons were pretextual. (*Ibid.*) In the course of a lengthy discussion of the evidence (or lack thereof) of actionable conduct, the court stated that "[*u*]*nder the circumstances here*, the investigation and decision [to transfer the plaintiff rather than discipline her] were not themselves actionable, but were intermediate steps that led to the transfer." (*Id.* at pp. 392-393, italics added.)

Needless to say, the circumstances in *McRae* are not the circumstances here. *McRae* does not support the proposition that a pretextual investigation is not an adverse employment action, and defendant cites no other authority that does so. (See also *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1052 ["Retaliation claims are inherently fact-specific, and the impact of an employer's action in a particular case must be evaluated in context. Accordingly, although an adverse employment action must materially affect the terms, conditions, or privileges of employment to be actionable, the determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim."]; cf. *Whitehall v. County of San Bernardino* (2017) 17 Cal.App.5th 352, 366-367 [administrative leave may constitute an adverse employment action].) We thus reject defendant's claim that "[n]one of the adverse actions specified in

17

plaintiff's operative complaint" meets the legal criteria for actionable conduct.

Second, defendant contends that plaintiff "cannot establish a causal link between any alleged adverse action and his alleged whistleblowing activity." This is said to be because Mr. Libby made the decisions to place plaintiff on administrative leave and to investigate plaintiff, and when he did so he did not know about the whistleblower complaints. Plaintiff's evidence, defendant tells us, does not directly refute Mr. Libby's declaration that he first heard about the whistleblower complaint after plaintiff's and Mr. Galbreath's interviews.

As *McRae* states, however, "[f]or purposes of making a prima facie showing, the causal link element may be established by an inference derived from circumstantial evidence." (*McRae, supra,* 142 Cal.App.4th at p. 388.) Defendant was in possession of a portion of plaintiff's whistleblower complaint before Mr. Dixon – who was special assistant to Mr. Libby – interviewed plaintiff and Mr. Galbreath. Defendant presented no declaration from Mr. Dixon explaining how he came into possession of the whistleblower complaint. Mr. Galbreath's declaration shows the explanation given to him on this point was implausible. Plaintiff also produced evidence that other investigators who filed whistleblower complaints were terminated shortly thereafter.

In short, while plaintiff did not produce a declaration that "directly refutes" Mr. Libby's declaration, we cannot ignore reasonable inferences that might be drawn from the circumstances plaintiff did show, particularly at this stage of the case.

Defendant cites *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52 (*Morgan*), where the court

18

held that the causal link necessary for a retaliation claim cannot be established "[i]n the absence of evidence that the individuals who denied appellant employment were aware of his past filing of a grievance." (*Id.* at p. 73.) *Morgan*, however, was a summary judgment case, with multiple declarations from the decisionmakers explaining their reasons for not rehiring the plaintiff and stating they had no knowledge of his previous grievance. (*Id.* at pp. 60-61.)

This is not a summary judgment case like *Morgan*; it is an anti-SLAPP case where there has been no discovery. We look for a prima facie factual showing, we do not weigh the evidence, we accept plaintiff's evidence as true, and we evaluate defendant's evidence " ' "only to determine if it defeats the plaintiff's claim as a matter of law." ' " (*Wilson, supra,* 7 Cal.5th at p. 891.) Indeed, even in a summary judgment case, the court may deny summary judgment in its discretion "if the only proof of a material fact offered in support of the summary judgment is an affidavit or declaration made by an individual who was the sole witness to that fact; or if a material fact is an individual's state of mind, or lack thereof, and that fact is sought to be established solely by the individual's affirmation thereof." (Code Civ. Proc., § 437c, subd. (e).)

In the circumstances here, we cannot say Mr. Libby's declaration defeats plaintiff's claims as a matter of law. We find plaintiff has demonstrated the minimal merit necessary to permit his case to proceed.

## DISPOSITION

The order is affirmed.  Plaintiff shall recover his costs on appeal.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

STRATTON, J.