Filed 10/1/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PATRICK NEJADIAN, | B285016 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC594904) |
| v. | |
| COUNTY OF LOS ANGELES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court for Los Angeles County, Susan Bryant-Deason, Judge. Reversed.

Schuler & Brown, Tina Javaherian, Jack Schuler and Irina Rosenberg for Defendant and Appellant.

The Finson Law Firm, Lowell W. Finson; Lenze Lawyers and Jennifer A. Lenze for Plaintiff and Respondent.

A jury found in favor of plaintiff Patrick Nejadian and against his employer, defendant County of Los Angeles (County), on Nejadian's causes of action for retaliation in violation of Labor Code[1] section 1102.5, subdivision (c) (hereafter, section 1102.5(c)), and for retaliation in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940 et seq.), and awarded Nejadian almost $300,000 in damages.[2] County appeals, raising numerous issues as to both causes of action, including that Nejadian failed to present sufficient evidence to support the jury's verdict on both claims. We conclude that County's sufficiency of the evidence arguments have merit.

Section 1102.5(c) prohibits "[a]n employer, or any person acting on behalf of the employer, . . . [from] retaliate[ing] against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." We hold that to prevail on a claim under this provision, the plaintiff must identify both the specific activity and the specific statute, rule, or regulation at issue; the court must then determine the legal question whether the identified activity would result in a violation or noncompliance with the identified statute, rule, or regulation, and, if so, the jury must determine the factual issue whether the plaintiff was retaliated against for refusing to participate in the identified activity. In the present case, the trial court declined to

[1] Further undesignated statutory references are to the Labor Code.

[2] The trial court subsequently reduced the amount of damages by approximately $40,000.

2

make the initial legal determination. Although this ordinarily would require a reversal and remand for retrial, we find no remand is necessary because Nejadian failed to present sufficient evidence at trial to establish that any acts he was asked to perform would result in a violation of or noncompliance with any identified state, federal, or local statute, rule, or regulation. Therefore, County is entitled to judgment on the section 1102.5(c) retaliation claim.

With regard to Nejadian's FEHA retaliation claim, the jury was instructed that Nejadian could establish that claim by proving that County subjected him to an adverse employment action in retaliation for "refusing to participate in activities that would violate state, federal, or local statutes, rules, or regulations and/or for complaining about age discrimination and retaliation in violation of FEHA." Because this instruction erroneously allowed the jury to find in favor of Nejadian even if no violation of FEHA was committed, the judgment on this claim must be reversed. As with the section 1102.5(c) claim, however, no remand is required here. Instead, we find that County is entitled to judgment in its favor because Nejadian failed to present evidence from which a reasonable jury could conclude that any adverse employment action he suffered was motivated by retaliation for complaints he made regarding discrimination or other activity protected by FEHA. Accordingly, we reverse the judgment and direct that judgment be entered in favor of County on Nejadian's complaint.

# BACKGROUND

## A.    *The Operative Complaint*

The first amended complaint, which was the operative complaint at the start of the trial, alleged causes of action for discrimination based on national origin and/or race, discrimination based on age, hostile work environment, and retaliation in violation of FEHA.  Before trial, the trial court granted County's motion for summary adjudication as to the first and third claims, leaving only the age discrimination and FEHA retaliation claims for resolution by trial.  Those claims were based upon the following alleged facts.

Nejadian began his employment with County in 1990.  At the time of the incidents at issue, Nejadian was a chief environmental health specialist (EHS) in the Environmental Health Division of the Los Angeles County Department of Public Health.  Nejadian alleged that beginning in 2008, after Angelo Bellomo became director of the Environment Health Division, Nejadian was subjected to verbal abuse and singled out for undue criticism by Bellomo on account of his national origin and/or race, and was denied promotions to manager positions in 2009 and 2015, and to an acting manager position in 2014, on account of both his age and his national origin and/or race.  He alleged that he complained to management, including Bellomo, about the discrimination and harassment, but was subjected to further adverse employment actions (including denial of multiple transfer requests) in retaliation for complaining.  He also alleged that he filed the substance of the claims alleged in the complaint with the Department of Fair Employment and Housing (DFEH) and/or the Equal

4

Employment Opportunity Commission (EEOC) and had received right to sue letters from those agencies.

In his cause of action for age discrimination, Nejadian alleged that he was over the age of 40 years old,[3] and therefore was a member of a protected class, and that he was fully competent and qualified to perform the duties of the positions to which he was denied promotions. He identified the denials of multiple promotions as the adverse employment actions to which he was subjected due to age discrimination.

In the retaliation cause of action, Nejadian alleged that he engaged in protected activity when he complained to management at County about workplace discrimination he suffered due to his national origin and/or race. He asserted that County subjected him to adverse employment actions—which he identified as "including but not limited to, the denial of multiple transfer requests"—in retaliation for engaging in that protected activity.

During the trial—after more than two days of testimony, which included all of Nejadian's testimony except with regard to damages, and a half-day of testimony by Bellomo (the Director of Environmental Health)—Nejadian's counsel moved to amend the complaint to add a cause of action for retaliation in violation of section 1102.5(c). County objected on the grounds that Nejadian failed to provide any reasonable excuse for his delay in adding the claim and that County would be prejudiced because it did not have any opportunity to conduct discovery

_____

[3]    Nejadian was 61 (almost 62) at the time of trial in April 2017.

5

or designate an expert witness, and because the elements of a claim for section 1102.5(c) retaliation are fundamentally different than the elements of a claim for FEHA retaliation. Finding no prejudice to County, the trial court granted the motion, and Nejadian filed a second amended complaint that included the former age discrimination and FEHA retaliation claims, plus a claim for retaliation under section 1102.5.[4]

B.    *The Trial*

    1.    *Evidence Presented*[5]

        a.    *Nejadian's Testimony*

Nejadian was the first witness called at trial. At the time of trial, he worked at a district office of the Environmental Health Division, supervising inspectors who inspected restaurants, swimming pools, and apartment buildings. He testified about his history with the Environmental Health Division, where he started in 1990 as an EHS-1,

---

[4]    Although the second amended complaint did not specify the subdivision of section 1102.5 under which the claim was brought, the trial court ultimately ruled that the case would go to the jury only under subdivision (c).

[5]    In our summary of the evidence presented at trial, we have omitted evidence that is relevant only to Nejadian's age discrimination claim (because the jury found County not liable on that claim), as well as many of the details regarding the alleged adverse employment actions Nejadian purportedly suffered before he filed his claims with the EEOC and DFEH (because those details are not relevant to our discussion). Our primary focus is on the evidence related to Nejadian's assertion that he was asked to violate a federal, state, or local statute, rule, or regulation, and the evidence related to his assertion that he was retaliated against for activity protected by FEHA.

and was regularly promoted until 2002, when he was promoted to a chief EHS position in the mountain and rural water and sewage program (which was known as the land use program). The land use program dealt with private wells and on-site waste water treatment systems (i.e., septic systems) on properties for which there are no public water or sewer systems.

After working in the land use program for several years, Nejadian transferred to a different program, but returned to the land use program in March 2009. He testified that he had been aware before he transferred back to that program that contractors and/or landowners (referred to as the "industry") had been complaining that there were inconsistencies from office to office within land use regarding how their plans were treated and what requirements were imposed. Nejadian took it upon himself to develop guidelines that would standardize the requirements for septic systems across all offices. By the end of 2009, he had completely rewritten the former set of guidelines and procedural documents for on-site wastewater treatment systems, and created a comprehensive document entitled "Conventional and Nonconventional On-Site Wastewater Treatment Systems Requirements and Procedures Manual" (referred to as "the Guidelines"), which is currently used (after some further revisions) throughout Los Angeles County and is posted on the Department of Public Health's website.

For purposes of the issues in this appeal, Nejadian's troubles began in 2010. Nejadian testified that after the Station Fire destroyed 16 or 17 homes in the Tujunga Canyon area, a contractor who was working with some of the homeowners on their efforts to rebuild their

homes complained to Director Bellomo that Nejadian and his staff refused to accept their existing septic systems because Nejadian believed they were in violation of "the Code."[6] Each time the contractor complained, Bellomo called Nejadian to his office to discuss the complaint, and Nejadian explained that the contractor's request had been denied because it violated "the Code" or the Guidelines. According to Nejadian, Bellomo told him to disregard some of the requirements of "the Code" (which requirements Nejadian did not specify) and sign off on the contractor's requests. Nejadian declined to do so, but the projects at issue ultimately were approved by Nejadian's managers or supervisors.

Nejadian also testified that he was asked to revise a set of guidelines that specifically addressed rebuilding structures following a fire or other natural disaster (the fire-rebuild guidelines) and to establish new rules for rebuilding. He testified that he revised the fire-rebuild guidelines, in which he did not allow rules that he believed were less protective than "what the County Code provides," but management amended them, "water[ing] down the requirement[s]" he had drafted, and "disregard[ing] the Code sections that were involved." Nejadian

---

[6] Throughout most of his testimony, Nejadian referred to "the Code," without identifying any specific provision. At one point, however, he narrowed it down to title 28 of the "County Code." At the end of his testimony, his counsel showed him two exhibits, which Nejadian agreed were "the Codes" that he was enforcing. Both exhibits consisted of a portion of a set of provisions identified as "Appendix K" (entitled "Private Sewage Disposal Systems"); one was from the 2007 version of title 24, part 5 of the California Code of Regulations and the other was from the 2011 version of title 28 of the Los Angeles County Code.

expressed his disagreement with management's amendments to Bellomo and other managers, telling them they violated the "L.A. County Code."

Nejadian testified that before these issues arose he had received very good performance evaluations. In his performance evaluation for 2009,[7] for example, his manager gave him high marks in every category; he was rated "outstanding" in one category and "very good" in the others. In his performance evaluation for 2010, however, his ratings were reduced in several categories; he received no "outstanding" rating, and was rated "competent" (rather than "very good") in three categories, with an overall rating of "competent." In the narrative portion of the 2010 evaluation, his supervisor wrote: "During the wild fires in County, [Nejadian] was requested to establish some revised guidelines for property owners to utilize in expediting the 'after-fire' rebuild process. When these revised guidelines were amended and withdrawn by management, [Nejadian] lost interest in continuing the effort. Mr. Nejadian is not receptive to guidance or instruction on how, when or where to proceed to make changes in his program. When guidance or instruction was offered, he was exceptionally [resistant] to change. [¶] . . . [¶] Most recently, the Bureau Director suggested some changes in interpretation of the Plumbing Code. [Nejadian] continued to argue the point, communicated with outside sources to refute the decision even after County Counsel agreed and approved the change."

---

[7] Nejadian received annual performance evaluations; the time periods began on October 1 and ended on September 30 of each year.

Due to his disputes with management over the requirements under the Code, Nejadian asked to be transferred out of the land use program. His transfer request was not accommodated. He complained to Bellomo, telling him that he wanted to transfer because Bellomo's approvals of systems that were not in compliance with "the Code" was making his job much more difficult than it should be. He continued to file transfer requests every six months, in accordance with Department policy, until he finally was transferred to the Glendale office of the Bureau of District Surveillance and Enforcement in January 2014.[8]

In the meantime, Nejadian's annual performance evaluations returned to prior levels. In 2011 and 2012 he received "very good" in all categories. In 2013 and 2014 he received "outstanding" in two categories and "very good" in the rest. He received an overall rating of "very good" in all four years.

In 2014, there was a posting for an EHS manager position. Nejadian, who had all the required qualifications as well as the desired qualifications identified in the posting, signed up for the exam. The exam consisted of two parts: (1) an evaluation of training and experience based upon the information on the application and supplemental application; and (2) an oral interview covering training,

---

[8] On cross-examination, Nejadian admitted that he had been offered a transfer earlier but had turned it down because it was not for one of the preferences he had listed in his transfer request. Bellomo testified that Nejadian's transfer requests could not be accommodated until he could find a suitable person to take Nejadian's position. Bellomo said, however, that he did offer Nejadian a transfer at one point, but Nejadian did not accept the transfer.

experiences, personal fitness, and general ability to perform the duties of the position. Candidates who achieved a passing score of 70 percent or higher were added to the eligible register, which was used to fill vacancies. During the months the exams were being conducted, some manager vacancies were filled on an "acting" basis through out-of-class appointments; Nejadian did not receive one of those appointments. Nejadian took the manager exam, but learned in January 2015 that he was not chosen for the position. He went to the human resources department to look at his score and saw some discrepancies, so he filed an appeal. When that appeal was denied, Nejadian filed a complaint with the EEOC.

Nejadian's EEOC complaint, which was filed on February 2, 2015, identified three actions he asserted were discriminatory: the denial of promotion to an EHS manager position in 2009 (which he explained he included to demonstrate the pattern of discrimination), the denial of promotion to an EHS manager position in 2015, and the denial of an out-of-class acting manager opportunity in 2014. Nejadian also stated in his EEOC complaint that Division Director Bellomo and the Assistant Division Director, Terri Williams, demonstrated hatred toward him and repeatedly made demeaning comments to him. In addition, Nejadian provided examples of conduct by Bellomo and others that he asserted was in retaliation for Nejadian expressing his disagreement with staffing decisions (e.g., requiring Nejadian to cover two offices, reducing field staff, etc.) and his displeasure at Bellomo's disregard of departmental policies with regard to the fire-rebuild guidelines. Finally, Nejadian stated that after the incident regarding

11

the fire-rebuild guidelines, Bellomo retaliated against him by disregarding the transfer requests he submitted every six months.

On the same day Nejadian filed his EEOC complaint, he also filed a complaint with the DFEH, asserting that he was discriminated against when he was denied promotion to acting Envision Connect manager in April 2014, and was denied promotion to EHS manager in January 2015. Seven months later, Nejadian (now represented by counsel) filed another complaint with the DFEH. This new complaint was substantially similar to the earlier EEOC complaint.

Finally, Nejadian testified that there were three vacancies in EHS manager positions after he filed the EEOC and DFEH complaints. He wrote to the current Director, Terri Williams (Bellomo had been promoted, and Williams moved into his former position), to express his interest in being placed as an acting manager for one of those positions. He was not placed in any of the positions. Instead, two of the positions were filled by other employees, both of whom are younger than Nejadian; the remaining position was not filled.

> ### b. *Bellomo's Testimony*

Bellomo was hired by County as the Director of Environmental Health in January 2008. He testified that Nejadian came to his attention in around 2010 due to a number of complaints that were made by industry individuals about how the land use department was handling approvals for properties they were trying to rebuild after the Station Fire. Bellomo explained that generally, when a property owner wants to remodel, expand, or rebuild a home with a septic system, the

owner has to upgrade the system to the current standards. After the wildfire, the County Board of Supervisors asked the Department of Public Health to find a way to assist homeowners who had lost their homes in the fire. In response, the Department developed a fire-rebuild policy that allowed the affected homeowners to keep their same septic systems, without having to upgrade to current standards, when they rebuilt their houses. According to Bellomo, Nejadian expressed his displeasure with that policy, believing that the systems should be brought up to current standards.

Bellomo explained that the Department developed this fire-rebuild policy with input from the land use program and other advisors. The fire-rebuild policy is set forth in fire-rebuild guidelines, which describe three different procedures, depending upon whether the owner is (1) rebuilding an equivalent structure and the originally approved floor plan is available for review; (2) rebuilding an equivalent structure and the originally approved floor plan is not available for review; and (3) rebuilding a new or modified (expanded) floor plan. Under each scenario, the guidelines list minimum requirements and the documents and information that must be submitted. The guidelines also set forth additional requirements for all scenarios, and note that a full feasibility study and compliance with current code requirements would be required if the septic system was not adequately sized to fully accommodate the proposed number of bedrooms, number of units, and/or plumbing fixtures, or the system was not functioning adequately, or the system was not code-compliant at the time it was installed.

Bellomo testified that the policy was reviewed by County Counsel to ensure that it was consistent with applicable laws. He stated that he was told the fire-rebuild policy was allowed under both Appendix K of the California Plumbing Code (which Nejadian had identified as the "Code" he was trying to enforce),[9] as well as section 101.3.1.1 of title 28 of the Los Angeles County Code that were in effect at the time of the events in question.[10]

Finally, Bellomo was asked by Nejadian's counsel about a specific case involving a homeowner, Duncan Baird, who sought approval to use the existing septic systems[11] for the rebuilding of his house, which had been destroyed in the wildfire. In that case, the Director of Environmental Protection Bureau, Alfonso Medina, wrote a letter to Baird following Baird's meeting with Medina and Nejadian regarding Baird's request. The letter addressed issues regarding the floor plan of

---

[9] Former Appendix K of the California Plumbing Code provided in relevant part that "[t]he Authority Having Jurisdiction may grant exceptions to the provisions of this appendix for permitted structures that have been destroyed due to fire or natural disaster and that cannot be reconstructed in compliance with these provisions provided that such exceptions are the minimum necessary." (Cal. Code Regs., tit. 24, pt. 5, former App. K, ¶ K 1 (A) (2007).)

[10] Section 101.3.1.1 of title 28 of the Los Angeles County Code provides in relevant part: "Any plumbing system may have its existing use, maintenance or repair continued when the Authority Having Jurisdiction determines that its use, maintenance or repair is in accordance with the original design and no hazard to the public health, safety or welfare has been created by such system."

[11] Baird's property had two septic systems.

14

the home that existed at the time of the fire, as well as the existing septic systems' compliance with the code in existence at the time of their installation.

According to the letter, Baird told Medina and Nejadian that he wanted to replicate the previous floor plan of three bedrooms and a small office. However, the septic system inspection report Baird submitted indicated that the house was built in 1939/1940 and contained only two bedrooms and two bathrooms. Medina informed Baird that when Baird was not able to provide any documentation showing what he contended was the floor plan that existed at the time of the fire, the Department conducted searches for additional property information, but only found information that was consistent with the inspection report of two bedrooms and two bathrooms.[12] Medina wrote that he discussed the issue regarding the previous floor plan with Bellomo, and it was decided that "the Department will yield to your email of May 28th and your statement that the house consisted of three bedrooms and [a] small office."

Addressing the issues regarding the existing septic systems, Medina wrote that the Department disagreed with Baird's inspector's conclusion that the systems were structurally sound. In addition, the Department concluded that the systems were not fully compliant with the plumbing codes from the 1940s and 1950s. Therefore, the

---

[12]    We note that in an email Nejadian sent Baird some months earlier, Nejadian stated that "most of the records that were kept in our district office were destroyed in a fire," and they were able to salvage only a handful of records relating to properties in the area.

Department made several recommendations for modifications to the systems, including the replacement of one of the tanks with a tank that was compliant with the 1940 Code. Medina also stated that the Department was willing to accept the installation of a new tank without the full feasibility study required under the fire-rebuild guidelines, as long as certain documentation was submitted and inspections were made.

In questioning Bellomo about Medina's letter, Nejadian's counsel focused on the part that addressed the size of the house that burned down. Counsel asked if Bellomo violated the law by ignoring the plans that showed the house had had two bedrooms rather than three bedrooms and an office. Bellomo replied that the letter merely showed that there was a dispute between the Department and the homeowner regarding what size the house had been. He explained that although there are a lot of decisions the Department makes that are based upon very definitive rules and regulations, some decisions are based upon discretion. And when resolving a dispute in which the homeowner disputes the accuracy of the plan that is on file, saying that he or she had filed a subsequent plan and no longer has a copy, it is within the discretion of the program chief and his or her supervisor as to how to handle it.

c. *Other Relevant Testimony*

Of the remaining witnesses, only a few provided testimony relevant to the issues on appeal.

i. *Nejadian's Complaints of Discrimination*

The only witness who testified that Nejadian complained to him or her that he was subjected to discriminatory treatment was Linda Ramirez. Ramirez, who was an EHS manager but was not Nejadian's direct supervisor at the time, testified that Nejadian told her a few years before trial that he felt he was discriminated against based upon his age. She said they discussed it as "professional coworkers." She did not report Nejadian's statement regarding the alleged discrimination because it was not a formal complaint.

Another EHS manager who worked with Nejadian at times, Aura Wong, testified that Nejadian told her that Bellomo treated him differently than he treated other people, but he never told her that he believed it was because of his age or some kind of retaliation.

ii. *Failure to Appoint Nejadian to Acting Manager in 2015*

Shelli Weekes, the Director of Human Resources for the Department of Public Health, testified that the Environmental Health Division attempted to post a bulletin for an acting EHS manager in 2016. Weekes, who had taken over as Director in November 2015 (she previously was an administrative services manager in the County Department of Mental Health), instructed the Division to take the bulletin down, explaining that "posting something is typically something you do for an actual exam." She testified that "to post for an acting position kind of gives the implication that you're offering somebody a permanent position, even if it's a temporary assignment.

17

And I wouldn't want to place somebody in a situation where they're assuming that they're being promised something."

Diana Aguilar is a staff analyst for the Environmental Health Division who is designated as the Environmental Health administrative liaison; one of her responsibilities is to liaison with the Human Resources department. She testified that before Weekes was appointed Director of Human Resources, when the Environmental Health Division had a vacancy it wanted to fill temporarily, it would send out a bulletin announcing an out-of-class assignment and conduct interviews for the temporary position. However, when the Division attempted to send out a bulletin for an out-of-class assignment to temporarily fill an EHS-4 position after Weekes became Director, the Human Resources department told the Division that it could not use that process. Therefore when, in 2016, the Division sought to temporarily fill two EHS manager positions, Aguilar contacted Human Resources for instructions.

Aguilar testified that Human Resources gave her a list of options and instructed her to start with the first option to see if that met her needs and if not, to try the next options one at a time. The first option was to gather all the performance evaluations and determine which employees received an overall "outstanding" rating. Aguilar testified that she looked at the 2014 and 2015 evaluations; she said that she did not consider the 2016 evaluations because some of them had not been submitted yet, so she thought it would be unfair to use them. Only two employees had received overall ratings of "outstanding." Both were offered, and accepted, the acting EHS manager positions.

18

### iii. Re-rating Nejadian's 2016 Performance Evaluation

In November or December 2016, Linda Ramirez, who was Nejadian's supervisor at the time, submitted to her director, Brenda Lopez, Nejadian's annual performance evaluation for the period that ended in September 2016. When Lopez reviewed the evaluation, she noticed there were comments in it regarding some projects Nejadian had done with land use, which Ramirez had cited in support of the "outstanding" rating she had given Nejadian in one category. She thought that was odd because Nejadian was not in land use during that rating period; he was in district surveillance and enforcement. She was concerned because it had been decided that if Nejadian was going to work on issues in land use he would do it on overtime, and it should have been discussed with Lopez beforehand. Because she did not recall having a discussion about it, she spoke to the branch director of the environmental protection program, to ask if she recalled Nejadian working on some land use issues during his 2016 rating period. The branch director did not believe he had done any work with land use during that time, but she was not sure. Lopez then called Ramirez and asked if she had emails or other documents to show that Nejadian had done land use work during the rating period.

In the meantime, Lopez pulled Nejadian's evaluation from the prior rating period (i.e., the 2015 evaluation) and saw that the narrative portion was almost identical to the 2016 evaluation. She told Ramirez that the two evaluations were virtually identical, and asked if the things she wrote about really happened during the 2016 rating period;

19

she asked if Ramirez had any documentation to verify what she wrote about.  In response, Ramirez sent Lopez some emails showing dates and times that Nejadian had corresponded with someone regarding land use work.  After she received that information, Lopez told Ramirez to put those dates and times in the evaluation and resubmit it.  When Ramirez resubmitted the evaluation, she had changed the "outstanding" rating she had given Nejadian in one category, and instead rated him "very good."  Lopez testified that she did not tell Ramirez to change those ratings.  Ramirez, however, testified that Lopez told her that if she could not substantiate the "outstanding" rating with significantly more support, she should reconsider her rating.

     2.     *Post-trial Motions, Jury Instructions, Deliberations and Verdict*

Following the close of evidence, the trial court heard County's motions for nonsuit on the section 1102.5(c) retaliation claim and directed verdict on the FEHA retaliation claim.  During the argument on the motion for nonsuit, counsel for County argued that Nejadian failed to present sufficient evidence to show any violation of a rule or statute, and noted that the issue whether there was an actual violation of law was one that should be decided by the court rather than the jury.  During the argument on the directed verdict, the trial court observed that counsel for both parties focused on the filing of the EEOC complaint as the basis for the retaliation, while the court saw the evidence as showing that the retaliation arose from the disagreement between Nejadian and Bellomo regarding the fire-rebuild policy.  Counsel for County explained that the disagreement over the fire-

20

rebuild policy was not a protected act that could be subject to a FEHA retaliation claim, but the court disagreed.

The court denied both motions, and turned to the jury instructions, specifically, what protected act would be identified in the instruction for the FEHA retaliation claim. Nejadian submitted a proposed instruction that described the protected activity for which County retaliated as "refusing to participate in activities that would violate state, federal, or local statutes, rules, or regulations and/or for complaining about age discrimination and retaliation in violation of FEHA with a government agency." County's counsel objected to the inclusion of the reference to the refusal to violate statutes, rules, or regulations, explaining that that activity is not an activity protected under FEHA and therefore should not be included in the FEHA retaliation instruction. The court overruled the objection, and instructed the jury with Nejadian's proposed instruction.

Turning to the instructions for the section 1102.5(c) retaliation claim, counsel for County again argued that the issue whether there was a violation of a statute, rule, or regulation was an issue of law for the court to determine. The court disagreed, stating that it was instructing the jury with the law, i.e., a portion of Appendix K of title 24, part 5, of the California Code of Regulations and section 101.3.1.1 of title 28 of the Los Angeles County Code that were in effect at the time of the dispute at issue.

Despite the trial court's overruling of County's objection to including the refusal to violate a statute, rule, or regulation in the FEHA retaliation instruction, the FEHA retaliation questions on the

21

special verdict form given to the jury referred to only Nejadian's complaint concerning age discrimination as the motivation for County's alleged retaliation. Question 4 on the verdict form asked, "Did the County of Los Angeles take an adverse employment action against Patrick Nejadian in retaliation for his complaint concerning discrimination based on age?" Question 5 asked, "Was Patrick Nejadian's complaint concerning discrimination based on age a substantial motivating reason for the County of Los Angeles' decision to take an adverse employment action against Patrick Nejadian?"

During deliberations, the jury sent a question asking, "What is the significance of the difference between questions 4 and 5[?] It seems like the same questions phrased differently." Discussing the jury's question with counsel, the trial court suggested that it could just refer the jury to the FEHA retaliation instruction. Counsel for County noted that County had objected to that instruction because it mixed the FEHA claim with the section 1102.5(c) claim, and County continued to have that same objection. After conferring with Nejadian's counsel, counsel for County suggested that the court simply tell the jury that question 4 had to do with whether there was retaliation, and question 5 had to do with whether the complaint about age discrimination was a substantial motivating factor for the retaliation. The court declined the suggestion, and instead directed the jury to the instructions on "substantial motivating reason explained" and on the FEHA retaliation claim.

The jury returned a verdict, finding against Nejadian on his age discrimination claim, but finding in favor of him on his FEHA retaliation and section 1102.5(c) retaliation claims. It awarded

22

$31,033.95 in past economic damages and $262,924.12 in future economic damages. County moved to reduce the award of future economic damages, which the trial court granted, reducing that portion of the award to $224,931.81. County also moved for a new trial based upon juror misconduct (a juror purportedly slept through portions of the trial and deliberations) and excessive damages. The trial court denied the motion. County timely filed a notice of appeal from the judgment.

## DISCUSSION

As noted, County raises several issues on appeal as to each claim for which it was found to be liable. In light of our conclusion that Nejadian failed to present sufficient evidence to support each claim, we will limit our discussion to those issues that relate to that conclusion.

A.     *Section 1102.5(c) Retaliation Claim*

Section 1102.5, a so-called whistleblower statute, provides that an employer, or person acting on behalf of the employer, is prohibited from retaliating against an employee for certain acts. Subdivision (b) prohibits retaliation against an employee for disclosing information to certain parties "if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties." (§ 1102.5, subd. (b).) Subdivision (c) prohibits retaliation against an employee "for refusing to participate in an activity that would result in a violation of state or federal statute, or

23

a violation of or noncompliance with a local, state, or federal rule or regulation." (§ 1102.5(c).)

On appeal, County notes that under section 1102.5(c), Nejadian was required to prove that the conduct he refused to participate in—approving rebuild plans based upon the fire-rebuild guidelines as interpreted by Medina and/or Bellomo—would result in an actual violation of or noncompliance with a local, state, or federal statute, rule, or regulation. County contends that judgment on his section 1102.5(c) retaliation claim must be reversed because Nejadian failed to present evidence that any approval he was told to give would result in a violation of any statute, rule, or regulation. We agree that Nejadian failed to present that evidence. But before we address that issue, we must first address who decides whether the asserted activity would violate a statute, rule, or regulation.

Unlike retaliation under subdivision (b) of section 1102.5, in which the employee must show only that he or she *reasonably believed* that there was a violation of a statute, rule, or regulation, section 1102.5(c) requires a showing that the activity in question *actually would* result in a violation or noncompliance with a statute, rule, or regulation. That is a quintessentially legal question. No findings of fact are needed to determine the question, because the question is limited to whether the activity that the plaintiff alleges he or she refused to participate in would violate a statute, rule, or regulation. Because that is a question of law, the court is required to make that determination. Once it is determined that the activity would result in a violation or noncompliance with a statute, rule, or regulation, the jury must then

24

determine whether the plaintiff refused to participate in that activity and, if so, whether that refusal was a contributing factor in the defendant's decision to impose an adverse employment action on the plaintiff.[13]

Of course, for the court to be able make the legal determination, the employee must identify what specific activity he or she refused to participate in and what specific statute, rule, or regulation would be violated by that activity. In this case, Nejadian mostly referred to the activities in generalities, with two exceptions.

The first exception involved a contractor, Cliff Jones, who was working for several homeowners who were affected by the wildfire. Nejadian testified that Jones wanted Nejadian to "allow the homeowners to rebuild with the existing system[s]," even though some of the systems needed to be upgraded. The only example for which he provided any specific evidence, however, involved a proposed installation of a new spa on a property in Altadena. According to a string of emails Nejadian introduced into evidence, Nejadian declined to give his approval unless the homeowner conducted testing to prove that

---

[13] We note that CACI No. 4603, the jury instruction setting forth the essential factual elements for claims under both subdivisions (b) and (c) of section 1102.5, instructs that the plaintiff must prove that his or her participation in the specified activity would result in a violation of a state or federal statute or a violation of or noncompliance with a local, state, or federal rule or regulation. We urge the Committee on Civil Jury Instructions to include in the "Directions for Use" an explanation that the trial court should make the legal determination whether the specified activity would result in a violation of or noncompliance with a statute, rule, or regulation, and instruct the jury regarding its determination.

the septic system could be expanded in the future if necessary. Nejadian testified that Bellomo wanted Nejadian to "disregard some of the rules" regarding testing for a backup septic system, and that Nejadian declined to do so.

The other exception to Nejadian's lack of specification involved the case of homeowner Duncan Baird. As noted, Baird wanted to use his existing septic systems when he rebuilt his house, and there were issues raised about the floor plan of the house as it existed prior to the wildfire and about whether the septic systems were structurally sound and complied with the plumbing code in existence at the time it was installed (which appeared to have been in the 1940s). Medina wrote a letter to Baird stating that the Department would accept Baird's statement regarding the floor plan on the home that was destroyed, but it would require Baird to make some changes to the septic systems (to bring them up to the requirements under the 1940 plumbing code); Baird would not, however, have to conduct a full feasibility study so long as certain other requirements were met.

Although Nejadian identified these two cases in which he objected to giving approvals, he failed to present sufficient evidence to show that the approvals would result in a violation of any specific state, federal, or local statute, rule, or regulation.

With regard to the installation of the new spa, although Nejadian did not refer to a specific rule that he contended approval would violate, we note that paragraph K 1 (E) of Appendix K of the California Plumbing Code in effect at the time of the request for approval stated that "[a]ll private sewage disposal systems shall be so designed that

additional seepage pits or subsurface drain fields, equivalent to at least one hundred (100) percent of the required original system, may be installed if the original system cannot absorb all the sewage."[14] (Cal. Code Regs., tit. 24, pt. 5, former App. K, ¶ K 1 (E) (2007.) There was no evidence presented in this case, however, that installation of the new spa would have had any effect on the existing septic system or whether the existing system was designed so that additional seepage pits or subsurface drain fields could be installed in the future. In fact, in the email string that Nejadian introduced, the contractor, Jones, stated that the installation of the new spa would not encroach on the existing septic system, would not prevent expansion of the septic system, would not increase the load on the existing septic system, and would not "in any way, shape or form have anything to do with the existing [septic system]." Thus, it appears that paragraph K 1 (E) does not have any application to this proposed installation.

Moreover, even if that paragraph might apply, if the spa that Jones was proposing to install was meant to replace a spa that was damaged or destroyed in the wildfire, paragraph K 1 (A) of Appendix K of the California Plumbing Code in effect then provides an exception to application of the requirements set forth in the other paragraphs of Appendix K. That provision states that the "Authority Having Jurisdiction" (i.e., the Environmental Health Division of County's

---

[14] Paragraph K 1.0 (E) of Appendix K of the Los Angeles County Plumbing Code in effect at that time includes almost identical language. (L.A. County Code, tit. 28, former App. K, ¶ K 1.0 (E) (2011).)

Department of Public Health) "may grant exceptions to the provisions of this appendix for permitted structures that have been destroyed due to fire or natural disaster and that cannot be reconstructed in compliance with these provisions provided that such exceptions are the minimum necessary."[15] (Cal. Code Regs., tit. 24, pt. 5, former App. K, ¶ K 1 (A) (2007).) As the party with the burden of proof, Nejadian was required to present sufficient evidence to allow a court to determine that this provision did not apply. He did not do so.

Finally, a provision of the California Plumbing Code in effect in 2010 specifically provided that "[p]lumbing systems lawfully in existence at the time of the adoption of this code may have their use, maintenance, or repair continued if the use, maintenance, or repair is in accordance with the original design and location and no hazard to life, health, or property has been created by such plumbing system."[16] (Cal. Code Regs., tit. 24, pt. 5, former § 101.5.3 (2010).) Although Nejadian testified about the importance of having a backup system for a septic

_____

[15] Paragraph K 1.0 (A) of Appendix K of the Los Angeles County Plumbing Code includes almost identical language. (L.A. County Code, tit. 28, former App. K, ¶ K 1.0 (A) (2011).)

[16] Section 101.3.1.1 of the 2010 Los Angeles Code similarly provided that "[i]n existing buildings or premises in which plumbing installations are to be altered, repaired or renovated, deviations from the provisions of this Code are permitted, provided such deviations are found to be necessary and are first approved by the Authority Having Jurisdiction. [¶] Any plumbing system [such as a septic system] may have its existing use, maintenance or repair continued when the Authority Having Jurisdiction determines that its use, maintenance or repair is in accordance with the original design and no hazard to the public health, safety or welfare has been created by such system."

28

system in case the existing system fails at some time in the future, he presented no evidence that the existing septic system for the property at issue currently presented a hazard to life, health, or property. In short, we conclude that Nejadian failed to present sufficient evidence to establish that approval of the installation of the spa would result in the violation or noncompliance with any statute, rule, or regulation.

With regard to Duncan Baird's property, although Nejadian did not testify about this specific property, his counsel in closing argument told the jury that approval of Baird's plan violated the fire-rebuild guidelines, which required a feasibility study if the rebuilt home was bigger than the home that had been destroyed or if the existing septic system was not working. The fire-rebuild guidelines, however, are not statutes, rules, or regulations. They are guidelines. Their purpose, as stated in the first paragraph, is "to establish standardized procedures for the review and approval of construction plans for rebuilding a structure following a fire or other natural disaster" in order to "expedite timely disaster recovery." Thus, a refusal to "violate" the guidelines does not fall within the scope of section 1102.5(c).

In any event, even if the fire-rebuild guidelines were to be construed as rules for purposes of section 1102.5(c), there was nothing in the guidelines that restricts the "Authority Having Jurisdiction" from exercising its power under Appendix K of the California and Los Angeles County Plumbing Codes to grant exceptions to the septic system requirements for structures that were destroyed by a wildfire, so long as the exceptions are the "minimum necessary." (Cal. Code Regs., tit. 24, part 5, former App. K, ¶ K 1 (A) (2007); L.A. County Code, tit.

29

28, former App. K, ¶ K 1.0 (A) (2011).)  Inasmuch as the evidence presented indicates that Baird's home was destroyed by a wildfire, and Nejadian failed to present any evidence that the exceptions granted in Medina's letter exceeded the minimum necessary, we conclude that Nejadian failed to meet his burden to establish that approval of Baird's plans would result in a violation of any statute, regulation, or rule.

Because we find that Nejadian failed to meet his burden to show that the activity he purportedly refused to participate in would result in a violation of a federal or state statute or a violation or noncompliance with a local, state, or federal rule or regulation, his section 1102.5(c) retaliation claim should have been dismissed.  Accordingly, we reverse the judgment as to that claim and order that judgment be entered in favor of County.

B.    *FEHA Retaliation Claim*

Government Code section 12940, subdivision (h) makes it an unlawful employment practice for an employer to retaliate against an employee because that employee opposed any practice forbidden by FEHA or because the employee filed a complaint, testified, or assisted in any proceeding under FEHA.  To establish a prima facie case of retaliation under FEHA, an employee "must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.  [Citations.]  Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment

30

action.  [Citation.]  If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation."  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).)

In this case, County contends that the trial court gave an erroneous instruction to the jury on the elements of Nejadian's FEHA retaliation claim by including his refusal to violate a statute, rule, or regulation as a possible protected activity.  County also contends that Nejadian failed to produce sufficient evidence to show that he was subjected to an adverse employment action following his protected activity, or to show that County's decision not to assign Nejadian to an acting manager position was motivated by Nejadian's protected activity.  We agree that the instruction was erroneous, and allowed the jury to find in favor of Nejadian despite the fact that he failed to present any evidence of an improper motive under FEHA.

### 1.    *Erroneous Jury Instruction*

As noted, the court gave an instruction on the FEHA retaliation claim that, over County's objection, informed the jury that in order to prove retaliation in violation of FEHA, Nejadian must establish that his "*refusal to participate in activities that would violate state, federal, or local statutes, rules, or regulations* and/or complaining about age discrimination and retaliation in violation of FEHA with a government agency was a substantial motivating reason for [County's] decision to subject him to adverse employment action."  (Italics added.)  The

31

italicized portion of the instruction was improper, because that conduct is not protected by FEHA. As stated in Government Code section 12920, the purpose of FEHA is to protect and safeguard the right and opportunity of all persons to obtain and hold employment and housing without discrimination on account of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status. Because the activity Nejadian refused to participate in would not have resulted in the violation of statutes, rules, or regulations prohibiting discrimination in employment or housing, the trial court erred by including the italicized language in the instruction on FEHA retaliation.

We acknowledge that the special verdict form given to the jury did not include the erroneously-included protected activity, and thus might have rendered the error harmless. However, when the jury expressed confusion about the questions on the special verdict form, the court directed the members of the jury, over County's objection, to review the erroneous instruction (along with the instruction on "substantial motivating reason explained"). Because the erroneous instruction allowed the jury to find in favor of Nejadian even if it did not find that his complaint about age discrimination was a substantial motivating reason for the failure to assign him to an acting manager position, the judgment in favor of Nejadian on the FEHA retaliation claim must be reversed. Although ordinarily a finding of an erroneous jury instruction would be remanded for retrial, we conclude no retrial is necessary here

32

because, as discussed below, Nejadian failed to present sufficient evidence to establish a claim for FEHA retaliation.

### 2. *Sufficiency of the Evidence*

#### a. *Protected Activity*

In his FEHA retaliation claim as alleged in both his first amended and second amended complaints, Nejadian alleged that he engaged in protected activity when he complained to County management about workplace discrimination, and was retaliated against for engaging in that activity. At trial, the only evidence Nejadian presented of complaints he made regarding discrimination was Ramirez's testimony that he told her that he felt he was discriminated against based upon his age, and the formal complaints he filed with the EEOC and the DFEH.

Nejadian's statement to Ramirez does not constitute protected activity under FEHA because Ramirez testified that she was not Nejadian's supervisor at the time of the conversation, the conversation was part of an informal discussion between coworkers, and she did not report Nejadian's statement to management. (*Yanowitz, supra*, 36 Cal.4th at p. 1047 [vague or conclusory remarks that fail to put the employer on notice are insufficient to establish protected activity].) Thus, the protected activity for which County is alleged to have retaliated against Nejadian is his filing of EEOC and DFEH complaints. Accordingly, Nejadian's retaliation claim is limited to adverse

33

employment actions that took place after the EEOC and DFEH complaints were filed in 2015.[17]

### b.    *Adverse Employment Action*

In its appellant's opening brief, County contends the only potentially adverse employment action that took place after the EEOC and DFEH complaints were filed was County failing to select Najadian to fill an acting EHS manager position in September 2016.  However, it argues that denial of appointment to a temporary acting position does not constitute an adverse employment action.  (Citing *Brewer v. Holder* (D.D.C. 2013) 20 F.Supp.3d 4 and other federal cases.)  Nejadian argues in his respondent's brief that he presented evidence that he was subjected to numerous adverse employment actions, although only three of those actions took place after he filed his EEOC and DFEH complaints.  He also contends that the denial of the acting manager position constituted an adverse action because there was evidence that being assigned to an acting position was beneficial to an employee's career trajectory, and often provided for monetary bonuses.  Neither party is entirely correct.

Nejadian asserts there were three adverse employment actions that took place after he filed the EEOC and DFEH:  the denial of an appointment to an acting EHS manager position, "withholding of the

---

[17]    Because retaliation under FEHA requires the plaintiff to show that the employer was motivated to retaliate by the plaintiff's protected activity, actions the employer took before the plaintiff engaged in the protected activity necessarily are irrelevant.

2015 performance evaluation," and "investigation for the 'outstanding' marks." Although Nejadian provides no details in his argument regarding the latter two actions, it appears that they refer to his testimony that at the time of trial he had not yet received his 2016 (not 2015) performance evaluation, and to testimony regarding the process that led to the re-rating of that performance evaluation. Because Nejadian failed to present any evidence to show how the delay in the delivery of his 2016 performance evaluation had any adverse effect on his employment, it cannot be the basis for a retaliation claim. However, the downgrading of his rating on one of the categories in his performance evaluation clearly is an adverse employment action. Therefore, we will include it when determining whether Nejadian presented sufficient evidence to establish County's retaliatory motive. We also will include the denial of the assignment to the acting EHS manager position, because Nejadian presented testimony that employees in acting out-of-class positions could apply for a monetary bonus, as well as other testimony from which a jury could conclude that employees who had been assigned to acting out-of-class positions were better positioned to be promoted due to their experience in the acting positions. Thus, County's reliance on *Brewer*, which held that ""denial of an acting position—*without showing some further harm*—does not by itself qualify as an adverse employment action""" (*Brewer v. Holder*, *supra*, 20 F.Supp.3d at p. 27, italics added), is misplaced.

### c.    *Retaliatory Motive*

County contends that Nejadian failed to present evidence that his filing of the EEOC and DFEH complaints was a motivating reason for County not appointing him to the acting EHS manager position or for re-rating him on his 2016 performance evaluation.  Nejadian counters that he produced sufficient evidence to prove a prima facie case for retaliation.  County's argument prevails.

Nejadian's response ignores his burden in this case.  As noted, if the employer produces a legitimate, non-retaliatory, reason for the adverse employment action, the presumption of retaliation raised by the employee's prima facie case disappears and the employee must then prove intentional retaliation.  (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042.)  The employee meets this burden by "prov[ing], [with] competent evidence, that the employer's proffered justification is mere pretext; i.e., that the presumptively valid reason for the employer's action was in fact a coverup.  [Citation.]  In responding to the employer's showing of a legitimate reason for the complained-of action, the plaintiff cannot "'simply show the employer's decision was wrong, mistaken, or unwise.  Rather, the employee "'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for the [asserted] non-discriminatory reasons.'"'"'"  (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 388-389 (*McRae*).)

We recognize that "[a]ctions for unlawful discrimination and retaliation are inherently fact-driven, and . . . it is the jury, and not the appellate court, that is charged with the obligation of determining the facts. Nonetheless, the jury's verdict stands only if it is supported by substantial evidence." (*McRae, supra*, 142 Cal.App.4th at p. 389.) "We may not substitute our view of the correct findings for those of the [jury]; rather, we must accept any reasonable interpretation of the evidence which supports the [jury's] decision. However, we may not defer to that decision entirely. '[I]f the word "substantial" means anything at all, it clearly implies that such evidence must be of ponderable legal significance. . . . It must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.'" (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203-1204 (*Beck*).)

"[A] judgment may be supported by inference, but the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork. [Citation.] Thus, an inference cannot stand if it is unreasonable when viewed in light of the whole record. [Citation.] And although an appellate court will normally defer to the trier of fact's drawing of inferences, it has been said: 'To these well settled rules there is a common sense limited exception which is aimed at preventing the trier of facts from running away with the case. This limited exception is that the trier of facts may not indulge in the inference when that inference is rebutted by clear, positive and uncontradicted

37

evidence of such a nature that it is not subject to doubt in the minds of reasonable [people].'" (*Beck*, *supra*, 44 Cal.4th at p. 1204.)

In the present case, County presented undisputed evidence that the decision to assign employees other than Nejadian to the acting EHS manager positions, and the decision to investigate and downgrade one of the ratings on Nejadian's 2016 performance evaluation were made for legitimate, non-retaliatory, reasons.

For example, County presented evidence that the Director of Human Resources of the Department of Public Health, Shelli Weekes, instituted a new method for making out-of-class temporary assignments when she was appointed to her position in November 2015. Weekes testified that she changed the method previously used by the Environmental Health Division, i.e., posting the position, because she believed it was inappropriate to post for a temporary position. Diana Aguilar, the Division's liaison to the Human Resources Department, testified that Weekes imposed the same restriction on posting for a vacancy in an EHS-4 position before the vacancies in the EHS manager position were sought to be filled, and that the method used to fill the acting EHS manager vacancies was based upon set criteria, i.e., the overall ratings in past performance evaluations.

Similarly, County presented evidence that Brenda Lopez, who reviewed all performance evaluations, investigated the 2016 evaluation for Nejadian because the evaluation indicated that Nejadian did some work for the land use program even though he had not been assigned to that program during the rating period. Then, when she compared the 2016 evaluation to the 2015 evaluation and saw that the narrative

portion of both were virtually identical, she asked Nejadian's supervisor, Linda Ramirez, who wrote the evaluation, for documentation to confirm that Nejadian had done the work for which he received an "outstanding" rating during the 2016 rating period. Ramirez testified that she lowered her rating in one category from "outstanding" to "very good" in response to Lopez's instruction that she should reconsider her rating if she could not substantiate it with documentary support.

Nejadian presented no evidence to """demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [County's] proffered legitimate reasons for its action[s] that a reasonable factfinder *could* rationally find them 'unworthy of credence,' [citation], and hence infer 'that [County] did not act for the [asserted non-retaliatory] reasons.""" (*McRae*, *supra*, 142 Cal.App.4th at p. 389.) Indeed, Nejadian does not even attempt in his respondent's brief to address County's proffered reasons, and instead merely asserts that he proved his prima facie case for retaliation. Because there was no evidence from which a jury reasonably could infer (without relying upon suspicion, imagination, speculation, or conjecture) that County acted in retaliation for Nejadian filing complaints with the EEOC and DFEH, the judgment in his favor on the FEHA retaliation claim must be reversed, with judgment to be entered in favor of County.

## DISPOSITION

The judgment is reversed, and a new judgment shall be entered in favor of County on Nejadian's second amended complaint.  County shall recover its costs on appeal.

**CERTIFIED FOR PUBLICATION**


WILLHITE, Acting P. J.


We concur:


COLLINS, J.


CURREY, J.

40